McLaughlin et al. *v.* Lansford Borough School
District et al., Appellants.

Argued April 11, 1938.   Before Kephart, C. J.,
Schaffer, Maxey, Drew, Linn and Stern, JJ.

18

W. D. *Lewis*, with him *J. C. Loose*, for appellant.

F. S. *Riordan*, with him *L. C. Scott*, for appellees.

OPINION BY MR. JUSTICE LINN, May 15, 1939:

This appeal brings up a suit by taxpayers against the directors of a school district of the third class. The directors appeal from a decree, quoted in full in the Reporter's statement of the case, restraining them from levying a school tax in excess of a certain limit and from otherwise acting unlawfully. Only the decree is assigned for error; not a single finding of fact on which the decree was based, was excepted to; the findings made will not be disturbed here *(Lenhart v. Wright,* 286 Pa. 351, 355, 133 A. 495), the one question for review, then, is whether the findings support the decree.

The learned chancellor was of opinion that it clearly appeared that the directors abused the power or discretion vested in them; in his adjudication he dealt separately with the subjects of complaint and, by his decree, eliminated so much of the challenged action of the board as was plainly beyond its power.

The evidence supporting the taxpayers' complaints came from school directors and from the superintendent of the district; it clearly sustains the findings and justifies defendants' counsel in not excepting to them. It is unnecessary now to recite each complaint that was sustained; but, to show the nature of the directors' failure to do what was required of them, reference may be made to several instances, generally illustrative. The average annual cost per pupil in this school district had reached the high figure of $95.40, whereas the average in third class school districts throughout the state was but $68.37. This, in itself, would invite scrutiny of the proposed budget. At the same time, the district was confronted with a reduction in tax assessments yielding approximately $37,000 less income from taxes than the year before. There was a general demand by taxpayers that school taxes should be reduced. Nevertheless, the school board increased the tax rate to $31\frac{1}{2}$ mills and imposed a per capita tax of $5.00. The president of the school board, with the experience of eight years as a school director to enlighten him, testified that he wrote an article which was published over his signature in a local newspaper at or about the time the budget was under consideration; it was entitled "Dr. Morgan presents School District case in tax issue." It began "As president of the Board of Education . . . I feel as though I should make a statement as to the policies of the Board to substantiate our position with relation to the millage increase." He suggested that the taxpayers should endeavor to obtain a reduction of their assessments by appeal to the county commissioners or to the ward assessors. He stated that he had informed a protesting taxpayer "that we are living in a highly-unionized territory that it is unfair to the board to ask that the Lansford directors take the initial steps. They are, however, willing to meet with the other boards in this Valley to discuss the question." His article continued: "It was particularly gratifying to note that

the Taxpayers' Association acted favorably on my suggestion to take the entire matter to the courts for decision. We agree on one count, namely: That the home owner in Lansford is entitled to some redress in the assessment valuation. The vital question—and the one on which the Association and the Board differ—is how to intelligently attack or proceed to acquire that reduction."

Referring to his approval of the appeal to the courts for relief, he was asked at the trial of the case, when his article was put in evidence: "Q. Well, the part there that the Court is interested in they would rather have the Court be the goat than the School Directors, . . . A. Well, Your Honor, we are out on a limb. You know that as well as us . . . I feel they would take it from the Court better than they would take it from us." His statement and evidence indicate an appreciation of a public duty that should have been, but was not, performed; did the board vote to increase the tax in the hope that the taxpayers would "take the entire matter to the courts for decision" and procure a decree against them on the theory that "they would take it from the Court better than they would take it from us"?

Defendant Giles D. Helps, the secretary, testified that he and the superintendent prepared a budget for submission to his fellow-directors. The superintendent is Dr. Balsbaugh who had held that office since May, 1926. He testified to information he gave to Mr. Helps showing "him that by the estimated enrollment next year we could do with less teachers on our staff in the elementary grades. Q. How many teachers less? A. Four. Q. Did he follow your suggestion? A. I don't know."

Dr. Balsbaugh informed Mr. Helps that he would be willing to accept $4,250 a year salary instead of the larger sum that he had been receiving. He said "That grew out of a discussion we had, because Mr. Helps was as much concerned as I was about the financial condi-

tion of the School Board. When we realized—I will put it this way—when I realized that the School District was losing approximately $37,000 in taxes, I felt that it was only fair to the property holders that we should assume about one-half of that loss and ask the property holders to assume the other half. We discussed that question from time to time again. On the way home from a meeting with Mr. Helps we were sitting in his car, we discussed it. He said, 'How will we assimilate that loss?' I said, 'I see no other way than we will have to reduce salaries, and you might as well begin with mine, a thousand dollars less than you are paying me now.' That was a suggestion, it was not an offer." The witness was also asked whether the number of teachers could be reduced in particular grades "without affecting the efficiency of the schools" and answered that it could, specifying particulars. Despite the superintendent's advice to the secretary that he would be content to accept the proposed reduction in salary to $4,250, the secretary did not even communicate it to his fellow-directors and participated in a vote for a higher sum; and notwithstanding the advice of the superintendent the board retained unnecessary teachers.

The evidence clearly shows that it was proposed to have clerical work, in a number of instances specified, done at rates much in excess of what should have been paid. The board had fixed the salary of their fellow-director, Mr. Helps, as secretary, at $600 per year. In reducing it the learned chancellor found as follows: "The work performed by the Secretary is negligible. About three-fourths of the Secretary's work prescribed by law is performed by the Superintendent of the School District and the clerk in his office." Reference has just been made to the evidence showing how this officer, in formulating the budget for submission to the board, failed to take advantage of the superintendent's offer to accept a reduction in salary and of his advice to drop several teachers not needed. So, too, the board had fixed

the salary of their fellow-director, Mr. Campbell, as treasurer, at $500 per year. In reducing it, the learned chancellor said: "The duties prescribed by law for the Treasurer are not performed by him. He keeps no books and his accounts are made up by the depositories [three banks designated by the board] who make monthly reports to the Board of Directors . . . of the accounts of the same. The only duties performed by the Treasurer are to make deposits of the state appropriations received by the School District, sign the payroll checks and the checks in payment of bills. All taxes collected are deposited daily by the Tax Collector; all checks are made up by the clerk in the Superintendent's office and merely signed by the Treasurer." Those findings are cited as illustrative and indicate the general character of the action of the board which the learned court below considered indefensible.

The power of the court, in the abstract, is not challenged. Appellants say that the court may not substitute its judgment for that of the board; we all agree with that. But when it clearly appears, as it does in this case, that the directors were not exercising judgment but were engaged in arbitrarily and, with knowledge, deliberately voting away the taxpayers' money in the respects indicated and corrected by the decree, the court must restrain them. The restraint of an unlawful expenditure is not a substitution of judgment, but a required declaration that the directors have failed to perform their public duty. A variety of illustrations of such action by the courts will be found in many decisions, among them: *Wilson v. Philadelphia School District,* 328 Pa. 225, 239, 195 A. 90; *Ritzman v. Coal Township School Directors,* 317 Pa. 271, 176 A. 447; *Coal Township School Directors,* 290 Pa. 200, 138 A. 748; *Summit Hill School Directors' Removal,* 289 Pa. 82, 137 A. 143; *Hibbs v. Arensberg,* 276 Pa. 24, 119 A. 727; *Mason v. Hanover Township School District,* 242 Pa. 359, 89 A. 552; *Lamb v. Redding,* 234 Pa. 481, 83

A. 362; *Appeal of Delano Land Co.,* 103 Pa. 347; *Conners' Appeal,* 103 Pa. 356; *St. Clair School Board's Appeal,* 74 Pa. 252. The school director's office is impor- tant; the director must familiarize himself with the elements of the questions to be solved in order that he may perform his duties intelligently; where the statute vests him with discretion, he must act in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs.* See also *Schuck v. School District of Baldwin Twp.,* 296 Pa. 408, 414, 146 A. 24. We should, perhaps, add that all the directors were not equally at fault; one voted against the proposed budget and one was absent.

The decree is affirmed, except that the costs shall be paid by all the appellants except Mr. Riebe who voted against the condemned budget.

DISSENTING OPINION BY MR. JUSTICE DREW:

I cannot justify or defend the action of the court below in constituting itself a "Super School Board" to determine school policy and administration. That the court did so is proven by its opinion and decree, which read like the minutes of a school board.

In examining the facts of this case, it is well to have in mind the law governing the relations of a school board to the public, which cannot be ignored or evaded. It is quite simple and can be stated in a single sentence—a school board has the sole power to determine school policy and administration so long as it does not act arbitrarily or capriciously.

That the court is not justified in substituting its opinion on matters within the discretion of the board for that of the directors is well settled: *Roth v. Marshall,* 158 Pa. 272; *Hysong v. Gallitzin Boro. School*

---

* This phraseology is taken from section 408 of the Business Corporation Law of 1933, P. L. 364, 390, 15 PS section 2852-408.

*District,* 164 Pa. 629; *Hibbs v. Arensberg,* 276 Pa. 24; *Campbell v. Bellevue School District,* 328 Pa. 197. In *Lamb v. Redding,* 234 Pa. 481, we said (p. 484) : "That all the things here complained of . . . are within the power delegated to the school board, is not open to question; and presumably the determination of the board to do these things rests upon considerations of public welfare, and has been reached by the exercise of intelligent judgment in connection therewith. The burden of showing to the contrary, when the action of the school board is challenged with respect to matters committed to its discretion, is a heavy one; for the powers of the courts in such cases is exceedingly limited, and they are permitted to interfere only where it is made apparent that it is not discretion that is being exercised but arbitrary will or caprice. Discretion involves the exercise of judgment incidental to the proper performance of the duty delegated. When the contention is that the proposed action is unwise, no matter by what consensus of opinion this is shown, the law will refer it to mistaken judgment over which it has no supervision."

In the present case the court reduced numerous items in the budget totaling over $10,000 and then made a proportionate reduction in the tax millage. I cannot agree to sustain the decree of the court below in ordering the board to make these reductions. An examination of the various items reduced clearly shows that the court unjustly interfered with reasonable and necessary expenses of the school district. The budget did not increase any salaries or provide for any additional teachers, but on the contrary eliminated one teacher and reduced expenses by $11,000 from the figures of the previous year, and before the date of the hearing in this case, there had been a further reduction of $4,600. In spite of this the learned chancellor decided that the board should have made still further reductions and proceeded to make them himself, with the result that he re-

vised the whole schedule of expenditures to meet his own desires.

The budget adopted by the board provided for sixteen elementary grade teachers, but the chancellor decided that fifteen were sufficient—that by a consolidation of the rooms in several of the grades one teacher could be eliminated and one salary reduced from the amount allocated for salaries. The court based its conclusion, and the majority sustains it, solely on the fact that the Superintendent believed that such consolidation would be advisable. While this court must accept the chancellor's finding of fact that this is what the Superintendent believed, we are not compelled to accept his opinion that it actually was desirable, particularly since the board decided otherwise. The directors had considered the proposed consolidation and having already eliminated one teaching position believed that any further reduction by consolidation would overcrowd the rooms. There is no indication that they acted arbitrarily or that they failed to properly perform their duties. On the contrary, since the proposed consolidation would in one case place over fifty pupils in one room, it is apparent that the board was acting for the best interest of the school children. If a court can arbitrarily decide the number of teachers a district can employ, or as here go to the extent of overruling the board regarding a single employe, the discretion of the board is destroyed, and the power of the board to fix policy and administer school affairs is at an end.

Likewise it seems to me that the court below usurped the functions of the board in reducing the salaries of the Principal, the Superintendent, and their clerical assistants. I need only quote from its opinion to show that the court felt it had complete power to revise the entire budget and adopt any amounts that it desired: "The Principal's office is in the same building as the Superintendent's office. It appears from the evidence that the Superintendent maintains constant supervision

over all the teachers in the Middle Ward building and there is no necessity of the Principal duplicating such supervision . . . The Principal elected never had any experience as a principal and the Board fixed his salary at $3,000 per year. He only teaches one hour per day. Apparently his duties are to meet visitors. This is entirely unnecessary as the Superintendent's office can perform all this . . . It is not in the interest of economy or the taxpayers and is entirely an abuse of discretionary power on the part of the Board, to pay a Principal $3,000 per year for one hour of teaching a day, and a salary of $2,400 is fair and reasonable." There is not the slightest inference that there was a violation of duty or any improper influence that motivated the Board. Instead the court, overlooking the fact that the Board had considered the budget in its meetings, and ignoring the law which gives the school board the power to determine matters such as this, accuses the board of having acted arbitrarily and then takes upon itself the duty of determining what should be paid and arbitrarily sets the salary at $2,400.

In abolishing the office of Principal's clerk, for which the budget had appropriated $1,300, the court said: "As to the work performed by the Principal's Clerk, it consists of work that readily can be done by the Principal himself, or should be done in the Superintendent's office, and, further, the duties she performs are unessential, and the setting forth in the budget of $1,300 as salary is an abuse of discretionary power." This statement is made in spite of the fact that a clerk had been employed to perform these duties for the past six years, that the record shows that the work kept the clerk occupied during the entire day, and that the school officials testified that a clerk was necessary. Notwithstanding all this, the court below took upon itself the responsibility of depriving the Principal and his office of clerical help. It is difficult to imagine a more fla-

grant violation of the cardinal principle that the school board is the proper body to administer school affairs.

The decree of the court below also restrained the board from paying the tax collector more than $2,400. The budget had allocated $2,900 as compensation for his services, based on a rate of 2% on collections made during the first ninety days and 5% on the balance. In determining his commissions, the board adopted the identical rate fixed by law for the collection of county, poor and borough taxes. It is difficult to see how it can possibly be said that the board abused its discretion by adopting the very same rate of compensation as that fixed for the collection of other taxes. I cannot imagine what fairer standard could have been adopted.

The salaries of the Secretary and the Treasurer of the board, which were both reduced by the decree of the court below, had been fixed by the directors at amounts which had been paid to those officials for many years and which compare favorably with salaries paid similar officials in other third class districts. The court below in ordering the reductions based its ruling solely on its own belief that the duties performed by these officials did not warrant the payment of these amounts, and the majority opinion justifies the reductions on the ground that the chancellor's finding that part of the work which they were by law required to do was done by others cannot be disturbed. Granted that this finding is correct, it only means that in the chancellor's opinion the work actually done by the Secretary and the Treasurer did not justify the salaries paid to them. But the directors knew just what work these officials did, and we must presume that they took this into consideration in reaching their decision: *Hibbs v. Arensberg,* supra. The result of the majority opinion is that the chancellor, merely because he finds as a fact that only certain work was done, is permitted to reduce the salaries set by the board even though that body, with the same facts before it, has already decided that for

the work actually done by these men the amounts set are reasonable. The chancellor is thus permitted to substitute his own opinion for that of the board and to order it to adopt his figures.

Having revised the budget in this manner, the chancellor thereupon decreed a reduction in the tax millage from the 31½ mill rate fixed by the budget to 28½ mills. Since the court had no power to revise the budget, it clearly was without power to alter the tax rate, since the facts show that a 31½ mill rate was necessary and reasonable. In considering this reduction it is well to have in mind the adverse economic conditions under which this and all school boards at the present time are compelled to operate. The economic depression which has afflicted this country for the past ten years has caused a tremendous shrinkage in property values and a corresponding decrease in tax assessments, with the result that schools and other institutions depending on public taxes for support have been severely pressed to secure the necessary funds to maintain essential public services. In the present case this result is strikingly apparent. During the year prior to the adoption of the present budget in May, 1938, the assessed valuations of coal lands in this district were reduced as a result of a decision of this court in *Lehigh Navigation Coal Company's Appeal*, 327 Pa. 327, in an amount which caused a reduction of tax revenue for the schools of $37,500. Since the budget requirements of the district are $157,552, this decrease in available revenue meant a loss of almost one-fourth of the amount needed for carrying on the school program.

With this serious situation facing them the school directors, after having cut down expenses as much as they felt could reasonably be done without impairing the efficient management of the schools, authorized a tax rate of 31½ mills and a per capita tax of $5. This levy represents an increase over the previous rate, but the facts conclusively show that the increase was neces-

sary. A 31½ mill tax would produce approximately $120,000 which, plus the per capita tax of about $22,000, would still require State aid to meet the $157,552 budget. State aid would still be necessary to carry the district, and there was no absolute guarantee that such aid would be available. In fact the State Department of Education had requested the district to levy a 35 mill tax. In these circumstances, with the State Department asking for a much larger tax, I can not see how the board can be accused of having abused its discretion. If a board cannot do what this board did it certainly is deprived of the most necessary power to carry on its educational program. The only possible way in this respect in which it could abuse its discretion would be to levy a tax for an amount clearly in excess of the needs of the district to reasonably and properly maintain a sensible school program.

The majority in upholding the decree reducing the tax levy rely somewhat on the newspaper article written by the president of the school board and his testimony relative thereto. The letter was an expression of his opinion that the board had done all it felt it could reasonably do to reduce expenses in the district, and pointed out that a representative of the largest taxpayer, the Coal Company, had carefully gone over the budget and had been unable to make any reduction. The letter gives no indication that the board had acted arbitrarily, but on the contrary shows that the board was anxious to coöperate in cutting down expenses had it felt further reductions were feasible.

It appears to me that the decision of the majority is clearly in conflict with the many decisions of this court relative to the powers of a school board. In *Hibbs v. Arensberg,* supra, the present Chief Justice said (p. 26): "Abuse of discretion does not, as a rule, come from unwise acts or mistaken judgment, but generally springs from improper influences, a disregard of duty, or a violation of law." In this case it is not even suggested that

any of these factors existed. In sustaining the action of the lower court the majority should realize that the obvious result will be, as stated in *Roth v. Marshall*, supra, that "the selection of teachers and textbooks, the fixing of the rate for the levy of school and building taxes, the arrangement of the course of study, together with other similar duties, will be hereafter done subject to the opinion of the courts."

I would reverse the court below and continue in the school boards of the Commonwealth the powers given them by our statutory and decisional law.

Mr. Justice STERN joins in this dissent.