# Borough of Bristol v. Bristol Borough School District

*Eastburn, Begley, Mandio, Kelton & Popkin,* for plaintiff.

*Biehn & Thatcher,* for defendant.

MONROE, J., October 11, 1963.—This action in ejectment has been brought by the Borough of Bristol, a municipal corporation located in the County of Bucks and State of Pennsylvania, against the School District of the Borough of Bristol, a quasi-municipal corporation within the said borough, to recover possession of two adjoining tracts of land, demised by the borough to the school district by leases hereinafter referred to. The complaint consists of two counts, the first count

seeking to recover possession of premises demised by plaintiff to defendant by lease of September 4, 1837, and the second count seeking recovery of possession of premises demised by lease of November 23, 1891.

The facts in the case are developed from the pleadings, consisting of plaintiff's complaint and defendant's answer thereto, and from a stipulation of facts submitted by counsel for the respective parties. From them we find the following:

By deed dated March 1, 1804, and recorded in the office for the Recording of Deeds in and for the County of Bucks, in deed book 34, page 323, the borough acquired by purchase, for 61 pounds, one shilling, a tract of land situate within the said borough, bounded on the east by lands of the Methodist Society, on the south by Wood Street, on the west by Mulberry Street and on the north by Pond Street.

By written lease dated September 4, 1837, recorded in the office for the recording of deeds aforesaid, in deed book no. 65, page 470, for a rental of $1 per annum, the borough demised to six named "directors of the common schools for the said Borough under the existing school laws of the Commonwealth . . . and their successors" what we shall herein refer to as lot A, being a portion of the aforesaid tract of land, more specifically that portion thereof situate on the north side of Wood Street

"BEGINNING at the southwesterly corner of the Methodist meeting house lot thence extending along the line of said street in a southwesterly direction fifty-nine feet to a corner thence at right angles from said Street one hundred and twenty five feet to an alley thence along said alley in a northeasterly direction to the aforesaid Methodist meeting house lot thence along the line of the same to the place of BEGINNING".

Following the execution of the above lease, a school building was erected upon lot A and was thereafter

used for public school classroom teaching purposes until June of 1922, and has not been used for such purposes since that time. However, since June of 1922, the school district made the lot A, and the school building thereon, available, rent free, for use at various times by a government training program, the Civil Air Patrol, and a drama workshop, all of which users had no connection whatsoever with the public schools of Bristol Borough. Additionally, the school district used the building erected on lot A for the storage of school facilities until sometime in 1958, when the building was demolished due to its decayed condition. Until demolition, the school district paid the cost of fire insurance premiums on the building, and it paid the cost of the demolition thereof. At the present time, lot A is vacant ground, and the westerly and northerly sides thereof abut upon premises later demised by the borough to the school district (and hereinafter referred to as lot B) and the said lot A is used by the school district, at irregular intervals, to gain access to the school building presently erected on lot B, although such means of access is not required for the school district's purposes, as the main entrance to the building on lot B faces Wood Street, from whence access is available over the ground included in the lease of lot B, and an adequate access exists thereto from Mulberry Street, upon which lot B abuts.

The school district has never passed a resolution declaring it to be the intention of the district to vacate or abandon the premises, lot A, demised by the lease of September 4, 1837, nor, since demolition of the school building which had been erected thereon, has it passed a resolution declaring the ground necessary for a common school.

By lease in writing dated November 23, 1891, and recorded in the office for the recording of deeds aforesaid, in miscellaneous book no. 26, page 541, the Bor-

ough of Bristol demised to the school district "for the full and complete term of ninety-nine years from the fourth day of September 1837", at a rental of $1 per annum, what we shall refer to as lot B, being a portion of the tract of land which the borough had acquired by the above-mentioned deed of March 1, 1804, and which, if one faced it from Wood Street, looking north, would give the appearance of an inverted "L" shape, the long arm of the "L" terminating at the northerly side of Wood Street, and the short arm of the "L" extending from the easterly boundary of Mulberry Street, in an easterly direction, to the line of lands of the Methodist Church, thus encompassing within its arms the westerly and northerly boundary lines of lot A. The formal description of lot B is:

"All that certain lot of land situate in the Borough of Bristol in the County of Bucks and State of Pennsylvania, bounded and described as follows: BEGINNING at a point on the northwest side of Wood Street fifty-nine feet southwest of the southwest line of land of the Methodist Episcopal Church, being a corner of a lot of land heretofore demised by the said lessor to the said lessee under a certain lease bearing date the Fourth day of September, A. D. 1837 and recorded in the office of the Recorder of Deeds &C., at Doylestown, in and for the County of Bucks in Deed Book No. 65 page 470, and extending thence along said Wood Street to the line of the northeast side of Mulberry Street, thence northwestardly along said side of Mulberry Street to a corner of other land of the said lessor now in the occupancy of Fire Company No. 2, thence northeastwardly at right angles with said Mulberry Street to the line of land of the Methodist Episcopal Church, thence along said land southeastwardly to a corner in the line of the land heretofore demised as aforesaid, thence southwestwardly along said land to another corner thereof and thence still by the same southeast-

wardly one hundred and twenty-five feet to the place of BEGINNING."

After execution of the last above-mentioned lease, the school district caused to be erected on lot B a school building which was used by it for public school classroom teaching purposes until sometime in December of 1955, and not thereafter. Between 1891 and 1922, when the use of the building on lot A for classroom teaching was discontinued, the Bristol Borough high school students attended classes in the buildings on lot A and lot B and the elementary school students attended classes in the building on lot B. Playgrounds of the respective buildings were not partitioned, and all students were permitted to use both or either, as they chose. Since 1955, the school district has used the building on lot B solely and exclusively for the storage of various school equipment and supplies useful and proper for school purposes, other facilities and buildings owned and occupied by the school district being inadequate for the storage thereof.

The school district never adopted a resolution declaring its intent to vacate or abandon the demised premises, lot B, or declaring the building or the ground necessary for a common school.

It is stipulated by the parties that:

". . . public schools within the Borough of Bristol, Bucks County, Pennsylvania administered by defendant and its predecessors in office have existed since the lease (of September 4, 1837) and still exists and are so administered within said Borough."

Although conceding that the Common School Law of Pennsylvania still exists, plaintiff borough argues that the purpose clause and the reverter clause in the lease, of 1837, of lot A must be read together as expressing the intention of the parties that the lease shall continue only so long as the Commonwealth's school laws are carried into effect with respect to the premises let by

the use thereof for classroom teaching purposes; in brief, that when lot A ceased to be used for classroom teaching purposes the condition for reversion accrued; that the reverter clause and the lessee's covenant of use in the lease, 1891, of lot B must be construed together and the same conclusion reached as a result thereof. The school district's positions are that there has been no formal resolution of abandonment, of either lot, as provided for in section 708 of the Public School Code of March 10, 1949, P. L. 30, 24 PS §7-708; there has been no failure of the conditions of either of the leases; charitable trusts were created which cannot be forfeited by nonuser.

In construing each of the leases before us, we must arrive at the intention of the parties from the entire instrument (Sterle v. Galiardi Coal & Coke Co., 168 Pa. Superior Ct. 254, 258 (1951) ), and not from particular words or phrases without reference to the entire context: Mowry v. McWherter, 365 Pa. 232, 239 (1950). Every part must be given its fair and proper meaning: Mattocks v. Cullum, 6 Pa. 454, 456 (1847). The subject matter and purpose of the lease must be considered (Camden Safe Deposit & Trust Co. v. Eavenson, 295 Pa. 357, 363 (1929) ), and also the circumstances under which the lease was made: Weigand v. American Stores Co., 346 Pa. 253, 256 (1943). When these principles are applied to the leases before us, any ambiguity arising from the wording of the purpose clauses and the reversionary clauses thereof, as well as any conflicts or inconsistencies therein, become more apparent than real. The wording in the respective leases is so nearly similar that the principles stated, and other pertinent law, may be applied with equal effect to both leases.

Turning first to the lease of 1837, lot A, the purpose and reverter clauses thereof are:

"For the purpose and use of a common school in said Borough and for no other or intent whatsoever:—

"Provided that the said Common School Law shall so long exist and continue in force in said Commonwealth and if at the expiration of said term of years the aforesaid school law with such amendments from time to time as the wisdom of the Legislature of the said Commonwealth may deem expedient to pass to promote public education shall continue and be in force then for another period of like term of years and from thence renewable so long as the Common School Law in said Commonwealth shall continue but in the event of the said school law or laws being repealed or ceasing to be carried into effect or acted upon, then and in that event this lease or demise or any subsequent one to be null and void and said lot with the appurtenances to revert and vest in the said (Borough of Bristol) for the use of said Borough as fully to all intents and purposes as if this lease had never been executed; . . ."

In construing the quoted clauses, a brief history of prior legislative efforts to create a common or public school system becomes pertinent. Prior to 1836, there was no established common school system in Pennsylvania, although efforts had been made toward that end, as a review of the acts of assembly of the period discloses. The schools then existing were operated by various religious societies and organizations, attended by children of those faiths, and neighborhood schools, many of which were incorporated, in the nature of private schools, supported, for the most part, by private contribution, and attended by children of the contributors (Martin v. McCord, 5 Watts 493 (1836) ; Wright v. Linn, 9 Pa. 433, 439 (1848) ; Kirk v. King, 3 Pa. 436, 441 (1846) ), and academies, supported also by private contributions or charges. These, the legislature recognized to be inadequate for the general welfare, as is evidenced by its enactment of legislation, from time

to time, to which we shall not specifically refer, requiring neighborhood schools to accept children of the poor at the expense of the counties, townships and boroughs, and the legalizing of lotteries for the erection of school buildings. Also, the legislature made grants to academies to assist them in constructing school buildings and upon condition that they educate children of the poor. For example, the Act of April 7, 1807, P. L. 403, granted $800 to the trustees of the Union Academy of Doylestown, and required that poor children, not exceeding three, be taught there gratis, but none to continue to be taught more than one year. An act "To provide . . . for laying the foundation of a general system of education throughout this commonwealth" was approved by the Governor on March 29, 1824, P. L. 279. Its life was short. It was repealed by the Act of February 20, 1826, P. L. 40. By the Act of April 2, 1831, P. L. 385, a school fund was established to be "applied to the support of common schools throughout this commonwealth, in such manner as shall hereafter be provided by law". Reciting its solemn duty to do so, and its desire to avail the people of the benefit of the school fund, the legislature enacted the Act of April 1, 1834, P. L. 170, "To establish a General System of Education by Common Schools". This act was repealed by the Act of June 13, 1836, P. L. 525, entitled "An act to consolidate and amend the several acts relative to a general system of education by common schools", which became the first permanent comprehensive legislation in the Commonwealth to establish a State-wide public or common school system. (The common school system had been established for the City and County of Philadelphia and the City of Lancaster.) It constituted every township, borough or ward, a school district. It provided for the election of school directors and invested them with the express duties, inter alia, of establishing common schools within their respective districts, erect-

ing, renting or hiring suitable school buildings for such school houses, exercising general supervision over the schools, and fixing the salaries of teachers. It empowered them to levy taxes for common school purposes. Section 14 of the act provided:

"The school directors of every school district in which the common school system has been adopted, or shall hereafter be adopted, shall have power to purchase and hold real and personal property, which may be necessary for the establishment and support of said schools, and the same to sell, alien and dispose of, whenever it shall be no longer required for the uses aforesaid, . . ."

The act was not without deficiencies. It was not mandatory that any municipality accept the common school system. The acceptance or rejection thereof was left in the hands of the electorate. If the system was accepted, its permanency in any district was not assured, for the act authorized the directors of each district, if they deemed it expedient, to submit to the electors, triennially, the question whether the common school system shall be continued or not.

Taking into consideration the foregoing and the then recognized inadequacies of the neighborhood, sectarian and academy schools, the abortive efforts of the legislature in 1824 and 1834 to establish a general school system, and its early repeal of those acts with consequent uncertainty of legislative intent as to the future Statewide permanency of the common school system, the acceptance of the Act of 1836, and thus, the common school system, by the electorate of the borough and the opportunity for its later renunciation at the hands of the same electorate, a reasonable construction of the intent of the parties would be that the burgess and council of the borough, and the school directors, recognizing the possibility of only a temporary existence for the common school system in the

borough or State, but desiring to establish that system and carry into effect the will of the citizens, agreed to a transfer to the school directors of a portion of the borough lands in such manner that if the purpose of the transfer failed, by act of the legislature or the electorate, the lands would revert to the borough.

There were, therefore, two primary considerations, the purpose of, or end to be accomplished by the transfer, and the assured reverter to the borough on failure of the purpose, whether by act of the legislature, or act of the electorate or otherwise. Although it may have been within the contemplation of the parties that a school house for active school teaching would be erected on the land, this, we believe, was secondary, the paramount consideration being the availability of the land to the school directors for such common school uses as they, within the discretion granted to them by the school laws, deemed most appropriate. Nowhere in the lease do the school directors undertake to erect a school house on the land or to continue to use one, if erected, for class purposes, and nowhere therein do the borough officials explicitly so require. We cannot accept the argument that the phrase "a common school" in the purpose clause contemplates a school house in actual use for classroom purposes, for it would have been easy to so state, as it was in Martin v. McCord, supra, where a parol grant was to build a school house for the neighborhood and grantor's grandchild, and in Kirk v. King, supra, where the grant was "for an English school house" and in Wright v. Lynn, supra, where the consideration mentioned was the "benefit of a school-house being erected in the neighborhood". Compare Madore's Appeal, 129 Pa. 15, 25 (1889), wherein the words in a deed "the said piece of ground to be used for milling or manufacturing purposes only", was held not to be a covenant, express or implied, that the grantee would erect a mill of any kind on the property. We think the

phrase was intended to express the intent that the premises were demised for the use of the common school system, as distinguished from the use thereof by an academy, a private neighborhood or sectarian school, or any other use to which the land might be put in the event the common school system should later fail within the borough. If the use were intended for the common school system, it would include any incidental use: Madore's Appeal, supra; and we do not believe that because the lease did not specifically recite that it was for the purpose of the common school system, it implicitly expresses the intention of the parties that the purpose was for active clasroom teaching only. The key is in the reverter clause, which provides for continuance of the lease for the full term of 99 years provided the common school laws "exist and continue in force in the Commonwealth", and for renewal of the term thereafter so long as the common school laws, with such amendments as are designed to "promote public education", continue in effect, and then specifically provides for reverter in event of the school laws being repealed (i.e., by act of the legislature), or ceasing to be carried into effect or acted upon (i.e., by act of the electorate of the borough), but says nothing specifically or by implication in aid of reverter if a classroom building is not erected on the land or continued in classroom use thereon. Forfeiture is not a favorite of the law and the right thereto must be distinctly reserved: MacCurdy v. Lindey, 349 Pa. 655, 661 (1944). Where, in a lease, causes of forfeiture are specified, it is not to be inferred that there are any grounds of forfeiture not declared to be such: McKnight v. Kreutz, 51 Pa. 232, 238 (1886).

The reverter clause is obviously a limitation upon the term of the lease and renewal thereof and was not intended as a limitation upon the uses made of the

premises so long as such uses remain within the purposes of the common school laws.

Immediately following the description of lot B, in the lease of 1891, appears the reversionary clause:

"For the full and complete term of ninety nine years from the fourth day of September A.D. 1837 at a rental of one dollar per annum for the said term; Provided however that in the event of the School Laws of the Commonwealth of Pennsylvania with such amendments as the Legislature of the said Commonwealth may deem it expedient to pass for the promotion of public education, continuing in force at the expiration of the said term, then this lease shall continue and be in force for a further period of ninety nine years And Provided further that in the event of the said School laws being at any time repealed or ceasing at any time to be carried into effect within the Borough of Bristol that then this lease shall cease determine and become void", which is so analogous to that in the 1837 lease that repetitious discussion is not necessary.

The purpose of the demise of lot B is thus expressed in the lease of 1891: "And the said lessee hereby covenants to and agrees . . . that they shall and will not sublet the said premises or any part thereof and that they shall and will not assign this lease or occupy or use the said premises except for such purposes as the requirements of the public schools or of the officers, teachers, or scholars of the said schools may demand", which, certainly, expresses the intention of the parties that the premises may be used for any legitimate public school purpose and contains no restriction of the use thereof to classroom activities.

It is conceded that until 1922, lot A was used for classroom teaching and, until 1955, lot B was so used and, consequently, that until those respective dates the several lots were used for common school purposes. The parties have stipulated that from 1922 until 1958, the

school district kept the building on lot A insured against fire, and used the building for the storage of school facilities, and at various times, within that space of years, made the building available, rent free, to a government training program, the Civil Air Patrol, and a drama workshop, which activities were not connected with the public schools of Bristol Borough. The stipulation does not inform us of the nature of the "facilities" stored in the building or what they were. We may assume that they consisted of articles of furniture, equipment, appliances and other supplies required in the efficient operation of the district's schools, the purchase of which had been enjoined upon the school district by the School Code of May 18, 1911, P. L. 309, and the Code of 1949, P. L. 30, and their various amendments. Such materials would be acquired and held for public school purposes: Commonwealth v. Zang, 142 Pa. Superior Ct. 573, 578 (1940). Section 602 of the School Code of 1911, empowered school directors to lease, in the name of the school district, all such real estate as they deemed necessary to furnish sites for school buildings. In Butler v. Purtell, 51 D. & C. 93 (1944), Little, P. J., in determining the authority of a school district to condemn land for use as a bus shelter, at page 100, said:

"We think the term 'school buildings' covers not only buildings used for instruction, but all buildings vital to the district as a part of the plant and necessary to carry out the provisions of the School Code. In rural districts where the one-room school is still in operation, it is necessary to construct outhouses separate from the building; they must be constructed according to plans provided by the State Department of Education. We believe that for all the purposes of the act they, too, are school buildings. Oftentimes it is necessary to construct woodsheds, coal houses, storage buildings, garages, etc.; they likewise as a part of the school plant are school

buildings. There is no valid reason to adopt a narrow definition of the term 'school buildings' in order to defeat the very purpose of the act..."

The Public School Code of March 10, 1949, P. L. 30, sec. 703, 24 PS §7-703, authorizes the board of school directors, in the name of the school district, to lease all such real estate as they deem necessary "to furnish suitable sites for proper school purposes". Since the building on lot A was used, between June 1922 and 1958, for the storage of articles held for public school purposes, it follows that the lot was used for such school purposes until 1958. The stipulation of the parties, aforesaid, does not recite that the use of the building was necessitated by lack of storage space in other buildings of the school district. But this is of no moment. Both the Code of 1911 and the Code of 1949, as above indicated, vest in the school directors the determination of the acquisition of the real estate for school-purposes, the amount and location of any real estate acquired for such purpose (Code of 1911, sec. 604; Code of 1949, sec. 702) and the selling, conveyance, transfer and abandonment thereof (Code of 1911, sec. 603; Code of 1949, sec. 703). It follows, therefore, that the determination of the necessity for the continued use of the property lies within the discretion of the board. With the exercise of that discretion we cannot interfere in the absence, as there is here, of proof of unreasonableness, or an arbitrary or capricious exercise of power: McKnight v. Board of Public Education, 365 Pa. 422, 427 (1950). See also Wilkinsburg Borough v. School District, 298 Pa. 193, 196 (1929); Campbell v. Bellevue Borough School District, 328 Pa. 197, 202 (1937).

The permitted temporary use, rent free, of the building on lot A for a government training program, the Civil Air Patrol and a drama workshop, does not constitute a violation of the terms of the lease of Septem-

ber 4, 1837, for which a forfeiture may be declared. Compare Pickle v. McKissick, 21 Pa. 232 (1853) ; McKissick v. Pickle, 16 Pa. 140, 149 (1851). Such use appears, from the stipulation, to have been occasional and only secondary to the use of the building as a storage place for school district property. The School Code of 1911, sec. 627, as amended by the Acts of May 20, 1921, P. L. 958, and March 31, 1927, P. L. 87, as does the Code of 1949, sec. 775, 24 PS §7-775, authorized boards of school directors to permit the use of school district property and buildings for social, recreational and other proper purposes, and also to make arrangements with any officials or individuals for the temporary use of school property for schools, playgrounds, social, recreational, and other proper educational purposes. These provisions were stated, in Larson v. DuBois Borough School Directors, 24 Dist. R. 680 (1914), to extend authority to school boards to permit the public use of school district grounds and buildings for social, recreational and other proper purposes, and, additionally, to make arrangements with associations or individuals for the exclusive and private temporary use of such property "for certain educational lines not in conflict with the common school system". It appears to us that uses for the activities mentioned fall within the scope of educational work. At least, in the absence of adequate supporting evidence or stipulation, we cannot hold to the contrary, in view of the presumption that the acts and decisions of school directors are reached in consideration of the public good and in a legal way after investigation: Campbell v. Bellevue Borough School District, supra, page 202.

It appears, therefore, that lot A was used for school purposes untl 1958, although other secondary uses, which did not defeat the purpose of the demise, were legally permitted on occasion.

Since 1955, the building on lot B has not been used for classroom teaching purposes, but since that time the school district has exercised dominion and control over the premises, insuring the same and using the building for storage of school equipment and supplies, other facilities and buildings of the district being inadequate for storage thereof. It is clear, therefore, that the school laws, remaining unrepealed, are presently being carried into effect in the Borough of Bristol and with application to the particular property, and, therefore, conditions for reverter have not attached. It is, therefore, our opinion that the lease of November 23, 1891, demised the premises therein described to the school district for educational and allied uses and that the said premises has, continuously from that time to the present, been applied by the school district to such uses.

The remaining question is whether, since 1958, lot A, demised by the lease of 1837, has been abandoned for common school purposes. We think that it has. In 1958, the building thereon was demolished at the expense of the school district. The ground is vacant. Its sole use since 1958 has been "at irregular intervals, to gain access to the school building constructed on" lot B, to which, according to the stipulation of facts, another mode of access is available and adequate through Mulberry Street and a mode of access is available from Wood Street, and access to the building on lot B by means of lot A is not required for defendant's purposes. It follows that the irregular or intermittent use of lot A to gain access to the building on lot B is at most a convenience only and neither necessary nor reasonably required for the proper use of lot B and adds nothing to the efficient administration or economy of the school district. It, therefore, cannot be said that lot A is presently being used for common or public school purposes. To the contrary, it must be held that its use for such

purposes was abandoned in 1958, and has remained so abandoned. No facts are stipulated from which it can be implied that this state of abandonment would not continue indefinitely. It must, therefore, be presumed that the abandonment is permanent: Beaver Township School District v. Burdick, 51 Pa. Superior Ct. 496, 505 (1912). Consequently, the school district's estate in lot A has terminated. Counsel for the school district cites M'Cullough v. The School Directors of Fourth Ward, 11 Pa. 476 (1849), to support his argument that the wisdom of using the land as an access way is within the sole discretion of the school board, which is the sole judge of whether the land is required and the purpose for which it is required. There, the authority of the school directors to abandon and sell a school site was questioned. That case held that sole discretion was vested in the school directors to determine whether land which had been purchased for the operation of a schoolhouse was longer required for school purposes. The decisions are legion that the trial court cannot constitute itself a "super school board" but may interfere when it is apparent that it is not the discretionary power vested in the board which is being exercised, but arbitrary will or caprice or fraud. For example, see Lamb v. Redding, 234 Pa. 481 (1912); McLaughlin v. Lansford Borough School District, 335 Pa. 17, 23 (1939), and cases there cited; Downing v. Erie City School District, 360 Pa. 29 (1948); McKnight v. Board of Public Education, supra; Spann v. Joint Boards of School Directors, 381 Pa. 338 (1955); Winger v. Aires, 371 Pa. 242 (1952). But no exercise of the school board's discretion has been shown since the demolition of the building in 1958, other than to leave the ground naked, vacant and unused, except as an unrequired access to lot B. No affirmative action, by resolution or otherwise, has been taken by the school board to indicate that at any definite time in the future the use of the lot will be returned

to school purposes. In our opinion, Beaver Township School District v. Burdick, supra, directs us to our conclusion of abandonment.

It is argued that there was no lawful abandonment because the provisions of section 708 of the Public School Code of 1949, 24 PS §7-708, were not complied with. That section provides that no property theretofore or thereafter acquired by a school district for school purposes shall be considered as abandoned until the board of school directors shall have passed, by a majority vote, a resolution declaring it to be the intention of the school district to vacate and abandon the same. In disposing of such an argument, based upon a similar provision in the Act of April 11, 1862, P. L. 471, sec. 4, Judge Rice, in Beaver Township School District v. Burdick, supra, at page 502, stated:

"To carry the argument to its logical conclusion, it would amount to this, that, though school directors lease land for school purposes for a limited period, they cannot lawfully discontinue the use of the land for school purposes at the expiration of that period, without observing the formalities prescribed by the act of 1862; or, to take a less extreme view, that, though, by the terms of the lease, the rights of the district end when the use of the land for school purposes is actually discontinued, and though the land is no longer needed, and therefore is not used, for school purposes, yet the right of possession may be perpetuated for all time by the mere refusal of the directors to pass a resolution in the manner and to the effect contemplated by the act. We cannot agree to a construction of the section which, without regard to the actual and expressed intention of the parties, would make it paramount to the clear terms of a lease under which the district obtained possession, or would enable the directors, by mere inaction, to nullify any of them. Such unreasonable construction is not required by the words of the section; nor is it required

in order to carry out any discoverable purpose which the legislature had in mind . . ."

The final argument on behalf of the school district is that the leases in question created charitable trusts which cannot be forfeited by nonuser. This argument was disposed of in Beaver Township School District v. Burdick, supra, which held that the principle does not apply to a lease of land which has expired by its own terms, Judge Rice stating, page 499:

"The broad statement, that a conveyance of land to trustees for a charitable use is not liable to be defeated by nonuser, is to be taken with a qualification depending on the nature of the conveyance, its limitation of the estate or interest conveyed, and its limitation of the use intended to be protected by it."

Further, Abel v. Girard Trust Co. 365 Pa. 34 (1950.), one of the cases cited in the brief on behalf of the school district, recognizes that the principle stated will not defeat provisions for reversion or forfeiture.

Another matter deserves examination, although neither party has suggested conclusions to be drawn therefrom. The term of the 1891 lease, including renewals thereof, is made to coincide with the term and renewals of the lease of 1837, the rental therein reserved is the same as that reserved in the 1837 lease, and the conditions for reverter are nearly identical in wording to those in the earlier lease. From 1891 to 1922, the buildings on both lots were used for high school classes, and the surrounding grounds were used as common play areas without separation, demarcation or distinction. Do these constitute factors evidencing an intention of the parties, in 1891 and later, that the two parcels demised by the respective leases should be held by the school district as an integrated whole for public school purposes and, in effect, set up one leasehold with the result that no part thereof should be considered abandoned for school purposes as long as any

part thereof remained in use for such purposes? We think not. If both parties intended that the leases should be construed together as leasing one unit of land for school purposes, reverting to the owner only when abandoned in its entirety, such intention would have effectively and clearly been accomplished by a completely new lease embracing both lots or by an amendment or revision of the lease of 1837 to include therein lot B. The use of both buildings for high school classes and the integration of the lots for recreational purposes were administrative procedures, exclusively in the control of the school district, with which borough had no right, legally or contractually, to interfere. Therefore, such unilateral administrative action cannot be construed as bilateral actions of the parties evidencing a construction which they mutually gave the leases. Since the parties chose to enter into a separate and distinct lease of lot B, making therein no reference to the lease of 1837, except in fixing reference points and boundaries in the description of Lot B, and reserving a separate and distinct, though nominal, rental for lot B, we conclude that it was not the intention of the parties to so integrate the lease holdings as to constitute an integrated unit with terms and conditions so co-extensive that each lease would stand as long as the other and neither lot would revert until such time as both were abandoned for school purposes. Why the term of the lease of 1891 was made to conform to the term of the lease of 1837 must remain conjecture, its significance dissipated in the passage of 70-odd years.

## Order

And now, October 11, 1963, on the first count of the complaint, judgment is entered in favor of plaintiff and against defendant, and defendant is ordered and directed to deliver to plaintiff possession of all that certain lot or piece of land situate on the northwest side of Wood Street in the Borough of Bristol, County of Bucks.

and State of Pennsylvania, bounded and described as follows:

"BEGINNING at the south westerly corner of the Methodist meeting house lot thence extending along the line of said street in a southwesterly directon fifty-nine feet to a corner thence at right angles from said Street one hundred and twenty five feet to an alley thence along said alley in a north easterly direction to the aforesaid Methodist meeting house lot thence along the line of the same to the place of BEGINNING".

On the second count of the complaint, judgment is entered in favor of defendant.