Frank ZAMPOGNA, Appellant

v.

### LAW ENFORCEMENT HEALTH BENEFITS, INC.

Commonwealth Court of Pennsylvania.

Argued Feb. 13, 2013.

Decided Nov. 27, 2013.

Samuel C. Stretton, West Chester, for appellant.

Marc L. Gelman, Philadelphia, for appellee.

BEFORE: PELLEGRINI, President Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge COVEY.[1]

Frank Zampogna (Zampogna) appeals from the Philadelphia County Common Pleas Court's (trial court) January 24, 2012 order dismissing Zampogna's Declaratory Judgment Action seeking a permanent injunction against Law Enforcement Health Benefits, Inc. (Health Benefits).[2] The sole issue before the Court is whether the trial court erred in not granting a permanent injunction and declaratory relief against Health Benefits.

■ The key facts are not in dispute. The Fraternal Order of Police, Lodge 5 (Union), a nonprofit corporation, represents Philadelphia police officers concerning the Union members' wages, hours and terms and conditions of employment with the City of Philadelphia (City). The Union's Collective Bargaining Agreement (CBA) with the City provides active and retired Union members and their families (collectively Members) medical, dental, vision and prescription drug coverage. It also establishes a "Joint Trust Board" (Joint Trust), the Union President appoints 80 percent of the Joint Trust's members, and the City appoints 20 percent of the members, to supervise and manage the delivery of healthcare benefits. Re-produced Record (R.R.) at A–74; Appellee's Br. at 2. In turn, the Joint Trust "determine[s] who would be in charge of administering the health benefits for the police officers...." R.R. at A–75. The Joint Trust selected Health Benefits to administer the Members' healthcare benefits. Health Benefits' paid Administrator/Chief Executive Officer, Thomas Lamb (Lamb), testified that "[Health Benefits'] existence is dependent upon the advocacy of the FOP [P]resident." Id. at A–75. He further acknowledged that because the Union President influences the composition of the Joint Trust, Health Benefits "exists at the pleasure of the Joint Trust Board." Id. at A–79. Lamb also testified that "[t]he Joint Trust has the capability of closing [Health Benefits]...." Id. at A–54.

Health Benefits is a nonprofit corporation which exists for the purpose of administering the Members' contractual health insurance benefits. Health Benefits is governed by a paid Board of Directors (Board). R.R. at A–170.

**[Health Benefits] is funded solely by funds required to be made by the [City] pursuant to the terms of a [CBA] between the City and [the Union]. The monies are then forwarded by the [Joint Trust] that receives contractual contributions from the City or are reimbursed to Health Benefits by the City as a result of the former's incursion of healthcare expenses on behalf of covered law enforcement personnel.[3]**

---

1. This opinion was reassigned to the Authoring Judge on September 10, 2013.

2. This order was reduced to judgment when Zampogna's post-trial motions were denied.

3. This undisputed fact is contrary to the Dissent's characterization that "[t]he majority reaches its result on the basis of the **mistaken assumption**" that "Health Benefits has spent 'public funds' or 'City funds.' " Dissenting op.

at 1052, 1061. The above quote is a direct admission excerpted from Health Benefits' answer to Zampogna's amended complaint, as well as an averment in Lamb's affidavit, and establishes that the Dissent's Staples analogy is inapposite. Moreover, this admitted undisputed fact is contrary to the inaccurate descriptions posed by the Dissent, i.e., "[h]ere, a private vendor used some of its corporate revenue, which it received from a union trust fund to administer health insur-

R.R. at A–154 (emphasis added), *see also* A–33–A–34, A–176.

■ During the 2010 Union President election in which Zampogna was a candidate, Health Benefits' Board was concerned about statements Zampogna had made which it believed were misleading and false. In response, the Board approved the decision to respond to Zampogna's statements through the expenditure of monies it received from the Joint Trust by publishing and mailing Union election materials against Zampogna and in support of and expressly endorsing the current Union President who subsequently won the election.[4] Zampogna filed a declaratory judgment action against Health Benefits requesting a permanent injunction to prevent Health Benefits from using public monies to engage in partisan activities. The trial court held a bench trial and, on January 24, 2012, denied the injunction and dismissed Zampogna's declaratory judgment action. Zampogna filed post-trial motions which the trial court denied on February 29, 2012. Zampogna appealed to this Court.[5, 6]

Zampogna argues that the trial court erred in finding that a nonprofit corporation funded by taxpayer money dedicated solely to the administration of healthcare benefits for active and retired Union police officers and their families could use those public funds to advocate, support, and circulate mailings to endorse a specific candidate for Union President. Zampogna further contends that the trial court erred as a matter of law in concluding that Health Benefits' endorsement and expenditure of public monies for one Union presidential candidate over another candidate was not a violation of Health Benefits' Articles of Incorporation, Bylaws, and the Pennsylvania Nonprofit Corporation Law of 1988 (Law).[7]

Health Benefits asserts that Zampogna, while running for Union President, was making misleading, material misrepresentations regarding Health Benefits' administration of the healthcare benefits. The Board, in an effort to protect Health Benefits from Zampogna causing detrimental harm, made an informed decision to have Health Benefits endorse the incumbent Union President and expend monies to prepare and have mailings sent notifying its members of Zampogna's misrepresentations about Health Benefits, and to endorse the current Union President.[8, 9] The

ance benefits for a city's police officers, to endorse a presumably friendly candidate for union office." Dissenting Op. at 1052.

4. Only FOP members could vote in the Union President election; therefore, not all of Health Benefits' Members were eligible to participate in the Union President election. R.R. at A–55.

5. Zampogna appealed to the Pennsylvania Superior Court. By Order dated May 12, 2012, the Pennsylvania Superior Court transferred the matter to this Court.

6. "Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether an error of law was committed." *Swift v. Dep't of Transp.*, 937 A.2d 1162, 1167 n. 5 (Pa.Cmwlth.2007). "Our

scope of review of the ... denial of a permanent injunction is limited to determining whether the trial court committed an error of law. The standard of review for a question of law is plenary." *Bd. of Supervisors of Milford Twp. v. McGogney*, 13 A.3d 569, 571 n. 5 (Pa.Cmwlth.2011) (citation omitted).

7. 15 Pa.C.S. §§ 5101–6162.

8. Zampogna does not claim that Health Benefits' expenditure of funds to respond to criticisms was improper.

9. The Dissent maintains that the "[Board] voted to respond to Zampogna's 'grossly misleading and deceptive statements'", while acknowledging that "[t]he record does not establish whether Zampogna's statements were meritorious or deceptive." Dissenting Op. at

cost of the mailings was $3,840.00. Appellee's Br. at 8. Health Benefits also included the same message in its newsletter at no additional expense.

Health Benefits maintains that Section 5502(a)(9) of the Law, 15 Pa.C.S. § 5502(a)(9), provides that nonprofit corporations have the power to make contributions and donations. In addition, it contends that Health Benefits' Articles of Incorporation permit expenditures for the purpose of engaging in "such other proper purposes incidental to" providing health benefits to its members. R.R. at A–165. Moreover, it avers that Health Benefits'

Bylaws vest the powers of Health Benefits in its Board not the court, to manage the corporation.[10]

Initially, we recognize that Section 5502 of the Law specifically provides: "(a) **General rule.**—Subject to the limitations and restrictions imposed by statute and, ... **subject to the limitations and restrictions contained in its articles,**[11, 12] **every nonprofit corporation shall have power:** ... (9) To make contributions and donations.**" 15 Pa.C.S. § 5502 (emphasis added). *Black's Law Dictionary*, 526 (9th ed. 2009) defines a donation as "[a] gift, esp. to a charity."[13]

1053, 1053 n. 2. However, the Board never addressed the alleged specific "grossly misleading and deceptive statements" nor presented any factual basis to dispute alleged deceptions. Dissenting Op. at 1053.

10. Health Benefits also argues that the United States Supreme Court's holding in *Citizens United v. Federal Election Commission,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), permitted it to endorse a candidate in the Union election. In *Citizens United,* the Supreme Court held that corporations, including nonprofits, cannot be barred from making expenditures for communications relating to elections. The *Citizens United* Court specifically established that corporations have a protected First Amendment right to engage in political speech. Health Benefits, thus, asserts that it had a free speech right to endorse Zampogna's opponent. However, this case is not about free speech, it is about whether Health Benefits' Board acted outside of its authority. Accordingly, *Citizens United* is not relevant to the instant matter. Notwithstanding, the Dissent relies upon *Citizens United* on pages 1055 and 1058 of its opinion.

11. The Dissent repeatedly maintains that the Majority opinion is contrary to the law and "limits the discretion of boards of directors...." Dissenting Op. at 1052. However, contrary to the Dissent's assertion it acknowledges the foundation of the Majority's holding several times in its opinion: "In other words, a non-profit corporation has broad powers, subject only to a limitation or restric-

tion set forth in a statute or in its corporate charter[;]" *"the Board* of Directors who shall have ... *the power* and authority to do and *perform all acts and functions not inconsistent with these Bylaws, the Corporation's Articles of Incorporation or law* [;]" and "the legislature has vested ... corporations ... with authority to do any act, unless 'restricted' or 'limited' by statute or by the corporation's articles or bylaws." Dissenting Op. at 1054 n. 3, 1055–56 (quoting R.R. A–169), 1058–59 n. 9 (quoting R.R. A–169), 16.

12. The Dissent mischaracterizes the Majority's holding by stating, "[t]he majority finds that Health Benefits lacks the power to engage in political activity because its charter does not specifically authorize such activity." Dissenting Op. at 1055. It is impossible to include in a corporation's articles or by-laws every conceivable power. Hence, the articles herein contain the language "to engage in such other proper purposes incidental to the foregoing." R.R. at A–165. However, this language does not grant the corporation an infinite derth of powers. The Majority disagrees with the Dissent's position that the corporate charter must contain a specific limitation. In the instant matter, the articles of incorporation as well as the Law do contain the express language: "subject to the limitations and restrictions contained in its articles[.]" R.R. at A–165; 15 Pa.C.S. § 5502(a). In addition, the natural effect of the language "to engage in such other proper purposes incidental to the foregoing" is one of limitation to the grant of power. R.R. at A–165.

Here, Health Benefits' Articles of Incorporation Addendum states, in pertinent part:

A.   The purpose of the Corporation is:

(a) **to receive, hold, invest, administer, and distribute funds to provide health and welfare benefits for, and on behalf of, the corporation's members (and such members' eligible spouses and dependents),** who are the members of the Fraternal Order of Police, Lodge No. 5 (a Pennsylvania nonprofit corporation) who are eligible to participate in the Blue Cross/Blue Shield health insurance plan (or such other health insurance plan) that is to be maintained by the Corporation for the benefit of such members;

(b) to engage in such other proper purposes incidental to the foregoing;

(c) to engage in all other proper operations for which corporations may be formed and operated under the Pennsylvania Not–For–Profit Code.

R.R. at A–165 (emphasis added).   Article III, Section 1 of Health Benefits' Bylaws establishes that:

The governing powers of the Corporation shall be vested in **the Board** of Directors who shall have charge, control and management of the property, affairs and funds of the Corporation, and who **shall have the power** and authority **to** do and **perform all acts and functions not inconsistent with these Bylaws, the Corporation's Articles of Incorporation, or law.**

R.R. at A–169 (emphasis added).   Converse to the Dissent's assertion that "the

corporation's charter and bylaws are broad enough ... to encompass the board's decision[,]" the Corporation's purpose and bylaws, as stated above, are specific and must be followed.   Dissenting Op. at 1052–53. Health Benefits' governing documents do not, in any manner of liberal construction, permit Health Benefits "to endorse a presumably friendly candidate for union office" with "revenue ... received from a union trust fund to administer health insurance benefits for a city's police officers[.]"   Dissenting Op. at 1052.

While the Law permits nonprofit corporations to make donations and contributions, said Law expressly provides that the donations and contributions are **limited** by the corporation's Articles of Incorporation. Health Benefits' Articles of Incorporation specifically state that the Corporation receives funds, holds funds, invests funds, administers funds and distributes funds for its Members' health insurance.   The alleged donation or contribution in this case is a postcard mailing to Health Benefits' Members which specifically states, in pertinent part:

[Health Benefits] has an obligation to take any necessary action to protect you and your family's medical benefits.   **We feel [Zampogna] is not competent enough and too inexperienced to lead the FOP and its 14,000 members.... [Health Benefits] is endorsing John McNesby and his team[.] Efficient— Steady—Experienced Leadership[.]**

R.R. at A–178 (emphasis added).   A copy of this postcard was included in Health Benefits' September 2010 newsletter as well.   R.R. at A–179. Health Benefits' Board approved the expenditure of the monies it received from the Joint Trust,

---

**13.** *Black's Law Dictionary* does not define "contribution" other than in the context of   tortfeasors.

pursuant to the City's CBA obligation, to prepare and mail said postcard.

According to Health Benefits' Articles of Incorporation, its purpose is to provide health and welfare benefits for its Members. Notwithstanding that Health Benefits has an additional function "to engage in other proper purposes incidental to" providing health and welfare benefits, campaigning for a union presidential candidate does not appear, even remotely, within Health Benefits' Articles of Incorporation.[14] R.R. at A–165. In addition, although **"to endorse"** a candidate through mailings may be considered a donation or contribution, said donation or contribution here is to the endorsed candidate's campaign. As the candidate is an individual unrelated to Health Benefits' purpose "to receive, hold, invest, administer and distribute funds to provide health and welfare benefits" or "incidental to the foregoing," a donation or contribution to his campaign clearly falls outside of both the Law, and Health Benefits' Articles of Incorporation. R.R. at A–165. Thus, the Board exceeded its authority and Health Benefits' expenditure of City funds for the Union President campaign mailing was clearly "inconsistent with [its] Bylaws, [Health Benefits'] Articles of Incorporation, [and] law." Health Benefits' Bylaws, R.R. at A–169.

Health Benefits contends that the Board was permitted to approve the mailing because Health Benefits' Articles of Incorporation authorized the Board to engage in any other incidental purposes, and its Bylaws vest the powers of Health Benefits in its Board. Specifically, Health Benefits maintains that courts are not permitted to substitute their judgment for the judgment of the Board. *Anderson v. Colonial Country Club*, 739 A.2d 1118 (Pa.Cmwlth.1999).

■ However, a corporation's incidental power must be "directly and immediately appropriate to the execution of the specific power granted, and not one that has merely some slight or remote relation to it." *Citizens' Electric Illuminating Co. v. Lackawanna & W.V.R. Co.*, 255 Pa. 176, 183, 99 A. 465, 467 (1916). Undertaking a "field of activity" totally separate from the corporation's "main purpose" will be found *ultra vires*. *In re Chosen Friends Castle No. 33*, 342 Pa. 60, 70, 20 A.2d 237, 241 (1941).[15] Consequently, campaigning for a union presidential candidate is not directly and immediately appropriate to providing

---

**14.** The Dissent maintains that "[a]n endorsement of a candidate, done apparently once by Health Benefits, is by definition an 'incidental' activity and not a new corporate undertaking." Dissenting Op. at 1058. However, *Black's Law Dictionary*, 1288 (9th ed. 2009) defines an "incident[al] power" as "[a] power that, although not expressly granted, **must exist** because it is **necessary to the accomplishment of an express purpose**." *Id.* (emphasis added). Clearly, endorsing a candidate for Union President is not necessary to the administration of health insurance. The Dissent maintains that the Pennsylvania Supreme Court defined "incidental" as "any 'subordinate' activity that is 'connected' and 'convenient' to the prosecution of the corporation's main purpose." Dissenting Op. at 1056 n. 5. However, our Supreme Court in *Malone v. Lancaster Gas Light & Fuel Co.*, 182

Pa. 309, 322, 37 A. 932, 933 (1897), expressly held: "Corporations may transact, in addition to their main undertaking, all such subordinate and connected matters as are, **if not essential, at least very convenient,** to the due prosecution of the former." *Id.* (emphasis added). Expending monies expressly designated for health and welfare benefits to endorse a candidate for Union President is not "essential" or even "very convenient" to the prosecution of Health Benefits' main purpose of administering funds to provide health and welfare benefits.

**15.** The Dissent maintains that *Citizens' Electric* and *Chosen Friends* are distinguishable and have little relevance today; however, the propositions cited therein are current Pennsylvania law and applicable to the instant matter.

healthcare benefits to the corporation's Members.[16] This action is not about Health Benefits supporting the Union; this case is about Health Benefits using taxpayer dollars to support one candidate over another candidate running for office. Here, the unrelated expenditure is even more egregious because "[Health Benefits'] existence is dependent upon the advocacy of the [Union] [P]resident."[17] R.R. at A-75.

█ The relationship between Health Benefits and the Union makes Health Benefits' endorsement of the Union presidential candidate even more suspect. The United States Tax Code defines "self-dealing," in pertinent part, as: "any direct or indirect—... transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a private foundation[.]" 26 U.S.C. § 4941(d). "[T]he term 'disqualified person' means, with respect to a private foundation, a person who is—... a foundation manager ...[.]" 26 U.S.C. § 4946(a)(1)(B). The above prohibited transaction is analogous to Health Benefits

which is managed by its paid Board whose positions are directly dependent upon the Union President, using health insurance funds to benefit the Union's President by contributing to his reelection campaign through endorsement propaganda. As such, the requirement that we defer to the Board's judgment is negated by the Board's self-dealing, which is clearly a conflict of interest.

Moreover, in addition to Lamb testifying that "[Health Benefits'] existence is dependent upon the advocacy of the FOP [P]resident," he further acknowledged that because the Union President influences the composition of the Joint Trust, Health Benefits "exists at the pleasure of the Joint Trust Board." R.R. at A-75, A-79. Lamb also attested that "[t]he Joint Trust has the capability of closing [Health Benefits]...." *Id.* at A-54. Consequently, this testimony further demonstrates the Board's conflict of interest, thereby, negating the requirement that we defer to the Board's judgment.[18]

---

16. Without any legal support the Dissent concludes, "[s]imply, a corporation's endorsement of a candidate for office is an incidental activity that does not require a specific power in the corporation's articles in order for the [B]oard to engage in this activity." Dissenting Op. at 1058.

17. The Dissent asserts that the Law "specifies that it is not self-dealing for a director to take action to retain 'the status or position of director' of the corporation he serves[,]" and cites 15 Pa.C.S. § 5715(e)(2)(iv). Dissenting Op. at 1061. However, 15 Pa.C.S. § 5715(e) merely defines "[t]he term 'disinterested director' as used in subsection (d) and for no other purpose ...[,]" and lists 8 examples including "(2) [a] person shall not be deemed to be other than a disinterested director solely by reason of ... (iv)[a]ny interest the director may have in retaining the status or position of director." *Id.* The Dissent's cited provision in no manner supports the facts herein, i.e., using public money contractually designated for health insurance to maintain the Board's paid positions.

18. The Dissent states that Zampogna should have filed a derivative suit against the Board and cites the business judgment rule in support of insulating board members in order to encourage individuals to become directors. Dissenting Op. at 1059 n. 11, 12. Derivative actions relate to finding directors liable for losses and the business judgment rule protects directors from liability. *See In re Lemington Home for Aged,* 659 F.3d 282 (3rd Cir.2011). This lawsuit is not about director liability. Rather, Zampogna filed the case seeking an injunction to prohibit the Board from expending public monies on unauthorized actions. Thus, the issue is whether the monies expended for the endorsement of a candidate for Union President violated the Law and Health Benefits' Articles of Incorporation and By-laws, and not whether the directors are liable for said expenditure. The Dissent maintains that Zampogna sued the wrong party. Dissenting Op. at 1059 n. 12. However, Health Benefits did not raise that issue and, therefore, it is not before this Court.

Furthermore, the Pennsylvania Supreme Court, while reviewing the actions of a school district's board of directors, expressly held:

The power of the court, in the abstract, is not challenged. Appellants say that the court may not substitute its judgment for that of the board; we all agree with that. **But when it clearly appears, as it does in this case, that the directors were not exercising judgment but were engaged in arbitrarily and, with knowledge, deliberately voting away the taxpayers' money** in the respects indicated and corrected by the decree, **the court must restrain them. The restraint of an unlawful expenditure is not a substitution of judgment, but a required declaration that the directors have failed to perform their public duty.**

*McLaughlin v. Sch. Dist. of Borough of Lansford,* 335 Pa. 17, 23, 6 A.2d 291, 294 (1939) (emphasis added).[19] As the expenditure of City funds to endorse a Union presidential candidate is not within the purview of Health Benefits' Bylaws or its Articles of Incorporation, the trial court restraining such action is not a substitution of judgment, but a required action.

■ The trial court opined: "Since there is no legal mechanism which prohibits Health Benefits['] political activity, this Court declined to issue an injunction prohibiting that conduct." R.R. at A–25. The trial court concluded that "without specific Bylaws, Articles of Incorporation, or laws prohibiting the use of public money in such a way, this Court cannot grant an injunction barring same." R.R. at A–25. Howev-

er; contrary to the trial court's ruling, there is no legal mechanism which **permits** Health Benefits' partisan activity. A corporation exists and only has such authority as that contained in and consistent with its Articles of Incorporation or Bylaws. This holding does not "limit[ ] the discretion of boards of directors operating under [the Law]" as stated by the Dissent. Dissenting Op. at 1052. Rather, it recognizes and upholds current Pennsylvania law. Because Health Benefits' powers are derived from its Articles of Incorporation and Bylaws, and such conduct alleged here does not in any manner fulfill Health Benefits' stated purpose of administering healthcare benefits to its Members, the trial court should have declared the action outside the Board's scope of authority.

The trial court also stated:

[W]hile [Health Benefits] does have the right to refute any derogatory remarks mentioned by a candidate either in a public or private election, in a situation where public money is expended to fund [Health Benefits], it may wish to consider the propriety of using the money on behalf of a particular candidate in either a public or private election.

R.R. at A–25. **Here, Health Benefits did not use public money to refute derogatory remarks made by a candidate,[20] it specifically used public money to endorse a candidate.**

We agree with Zampogna that Health Benefits would be irreparably harmed if the Board's approval of expenditures of

19. The Dissent discounts this holding because it "concerned a government agency's power to act, not that of a private corporation." Dissenting Op. at 1060. However, a nonprofit corporation is similar in that its authority to act, although not created by statute, is like a statute in that its powers are limited to its

governing documents. Accordingly, the holding is on point and instructive.

20. Neither party produced any evidence of Zampogna's alleged misleading statements about Health Benefits.

public money for partisan activity was allowed to continue unabated.[21] However, as the election giving rise to this action has already passed, we cannot reverse the trial court's denial of the request for injunctive relief. Zampogna asserts that, absent the Board's strict adherence to its Articles of Incorporation, the potential for another occurrence remains. The harm identified is that which may flow from the Board's failure to adhere to Health Benefits' express purpose as stated in its Articles of Incorporation. Therefore, we hold that the appropriate relief is the entry of a prospective declaratory judgment in favor of Zampogna declaring that the Board's expenditure of public funds on partisan activity violates the Law, and Health Benefits' Articles of Incorporation and Bylaws. *See Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190 (Pa.Cmwlth. 1995), *aff'd,* 544 Pa. 512, 677 A.2d 1206 (1996). Accordingly, for all of the above reasons, the trial court's order is vacated, and we remand this matter to the trial court and direct the trial court to enter a prospective declaratory judgment in accordance with this holding.

### ORDER

AND NOW, this 27th day of November, 2013, the Philadelphia County Common Pleas Court's January 24, 2012 order is vacated and the matter is remanded to the trial court to enter a declaratory judgment in accordance with this opinion.

Jurisdiction relinquished.

**21.** The Dissent declares that Zampogna did not prove harm; however, it is undisputed that there was an expenditure of funds on partisan activity, which was to be specifically used to receive, hold, invest, administer and provide health and welfare benefits, and that expenditure is the unauthorized action Zampogna is seeking to prohibit.

### DISSENTING OPINION BY Judge LEAVITT.

The majority's decision today limits the discretion of boards of directors operating under Pennsylvania's Nonprofit Corporation Law of 1988. This has the collateral effect of creating uncertainty and encouraging litigation over the discretion of the directors of for-profit businesses, which operate under identical provisions in the Business Corporation Law.[1] This limitation on discretion is contrary to law and to the long-standing precedent of our Supreme Court, which has accorded broad deference to corporate directors.

The majority reaches its result on the basis of the mistaken assumption that monies paid out of public funds for the purchase of goods and services retain their "public" character even after the private vendor has cashed the check. To the contrary, once a corporate vendor has cashed a check remitted to it by a government agency for goods and services, the monies become private corporate assets. They do not remain, as assumed by the majority, "public funds."

Here, a private vendor used some of its corporate revenue, which it received from a union trust fund to administer health insurance benefits for a city's police officers, to endorse a presumably friendly candidate for union office. The Court perceives this to be a problem. However, our distaste for this action does not allow us to depart from settled principles of corporate governance. These principles require the courts to defer to the decision of a board of directors, even if unwise or offensive,

**1.** In matters of corporate powers and governance, there is no difference between Pennsylvania non-profit corporations and those organized for profit-making purposes. *Cf.* 15 Pa.C.S. §§ 5501–5998 and §§ 1101–1998.

where the corporation's charter and by-laws are broad enough, as they are here, to encompass the board's decision.

## Background

Frank Zampogna is a Philadelphia police officer who ran for president of the Fraternal Order of Police Lodge 5 (Union) in 2010. In the course of his campaign, Zampogna distributed literature criticizing Law Enforcement Health Benefits, Inc., which administers the Union's health insurance benefits. Nevertheless, Zampogna requested Health Benefits to guarantee its "neutrality" in the election. Reproduced Record at A–180 (R.R. ——). Thomas J. Lamb, Executive Director of Health Benefits, denied the request in a two-page letter that countered Zampogna's criticisms and declared that Health Benefits not only had the right, but an obligation, to take a position on Zampogna's candidacy. It concluded:

[W]e shall protect the interests of our members in the maintenance and administration of a healthcare program that knows no equal.

It would be naive to believe that the outcome of the FOP election does not affect [Health Benefits].... *Accordingly, it is the right and obligation of the Board of Directors of [Health Benefits] to advise its membership where one candidate is, in [its] opinion, clearly superior to another* in terms of preserving and protecting the membership's healthcare benefits.

R.R. A–181 (emphasis added). Consistent with Lamb's letter, Health Benefits' Board of Directors voted to respond to Zampogna's "grossly misleading and deceptive statements" and to endorse the current Union president, John McNesby, in the upcoming Union election. R.R. A–178.[2]

Shortly before the election, Health Benefits sent postcards to Union members that read as follows:

**Law Enforcement Health Benefits, Inc.**
2230 Spring Garden Street • Philadelphia, Pa 19130 • (215) 763-8290 • www.lehb.org
*Thomas J. Lamb, Administrator*

**LEHB Will Take Any Necessary Action to Defend You and Your Family's Medical Benefits!**

One of the FOP Presidential candidates is making LEHB an FOP Election issue "AGAIN".

LEHB stood by when we heard his grossly misleading and deceptive statements because, unlike him, we know our members are smart enough to see through his rhetoric.

LEHB stood by when statements exposed his obvious inexperience and lack of contract negotiations procedures. He is now "throwing everything against the wall hoping something will stick".

**Desperate People Do Desperate Things!**

He is now calling Chairman Gary Cardamone and Tom Lamb liars, and is misleading our members regarding LEHB's city monthly contribution and reserve money amounts. He does not mention the fact that LEHB members had ONE (1) benefit change in seventeen (17) years.

LEHB has an obligation to take any necessary action to protect you and your family's medical benefits. We feel he is not competent enough and too inexperienced to lead the FOP and its 14,000 members. The City would be thrilled to have such an inexperienced negotiator representing the FOP.

**Vote for people who best represent your interests!**

| Unanimously approved by LEHB Directors! | LEHB is endorsing **John McNesby and his team** *Efficient—Steady—Experienced Leadership* *Thomas J. Lamb, LEHB Administrator* |

2. The record does not establish whether Zampogna's statements were meritorious or "deceptive."

R.R. A–178. The cost to print and mail these postcards was $3,840.

The trial court dismissed Zampogna's complaint. Because the majority objects to Health Benefits' endorsement of Zampogna's opponent, it directs the trial court to enter "a prospective declaratory judgment" to prevent future "partisan activity." Majority op. at 1051–52.

### Corporate Powers

The majority reads Health Benefits' corporate purpose, as set forth in its articles of incorporation, in a way that cancels out the authority of its Board of Directors to decide what advances the corporate purpose. However, a corporation's purpose and its authority to act are two separate and distinct concepts.

To begin, our Supreme Court has established that a corporation's stated purpose should not be construed as prohibitory of other acts. Over 100 years ago, it explained:

We know of no rule or principle by which an act creating a corporation for certain specific objects, or to carry on a particular trade or business, is to be strictly construed as prohibitory of all other dealings or transactions not coming within the exact scope of those designated.

*Malone v. Lancaster Gas Light & Fuel Co.*, 182 Pa. 309, 322, 37 A. 932, 933 (1897). Rather, corporations can do things not specified in their charters and transact "all such subordinate and connected matters as are, if not essential, *at least very convenient,* to the due prosecution of the [corporation's main undertaking]." *Id.* (emphasis added). Further, the Supreme Court directed that courts must defer to the judgment of the corporation's management when deciding whether the challenged corporate action is "fairly considered incidental or auxiliary" if "not within the literal terms of the corporate grant." *Id.* In accordance with these principles, the Supreme Court held that Lancaster Gas, with the charter purpose of "manufacturing and supplying illuminating and heating gas," could also sell gas appliances. *Id.* at 321, 37 A. at 933.

Statutory law has broadened the principles of *Malone*. The Nonprofit Corporation Law gives corporations "the legal capacity of natural persons to act." 15 Pa. C.S. § 5501. Natural persons engage in elections of every sort. The law also vests corporations with a laundry list of specific powers that range from use of corporate name to establishment of pension funds.[3]

---

**3.** Section 5502(a) vests non-profit corporations with a list of 19 powers, both specific and general, and states, in relevant part, as follows:

  (a) General rule.—*Subject to the limitations and restrictions imposed by statute* and, except as otherwise provided in paragraph (4) [involving real or personal property], *subject to the limitations and restrictions contained in its articles,* every nonprofit corporation shall have the power:

  \*    \*    \*

  (9) To make contributions and donations.

  \*    \*    \*

  (18) To have and exercise all of the powers and means appropriate to effect the purpose or purposes for which the corporation is incorporated.

  (19) To have and exercise all other powers enumerated elsewhere in this subpart or otherwise vested by law in the corporation.

15 Pa.C.S. § 5502(a)(9), (18), (19) (emphasis added). In other words, a non-profit corporation has broad powers, subject only to a limitation or restriction set forth in a statute or in its corporate charter.

That list concludes with the catch-all authority to "exercise all other powers enumerated elsewhere in this subpart or otherwise vested by law in the corporation." 15 Pa.C.S. § 5502(a)(19). One such power "vested by law" is the power of free speech. *Citizens United v. Federal Election Commission*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).[4]

Health Benefits' articles grant it powers that are as expansive as possible. Its corporate purpose is set forth in Article 4(a), which states:

(a) *to receive, hold, invest, administer and distribute funds to provide health and welfare benefits for, and on behalf of, the Corporation's members* (and such members' eligible spouses and dependents), who are the members of the Fraternal Order of Police, Lodge No. 5 (a Pennsylvania nonprofit corporation) *who are eligible to participate in the Blue Cross/Blue Shield health insurance plan* (or such other health insurance plan) *that is to be maintained by the Corporation for the benefit of such members.*

R.R. A–165 (emphasis added). This corporate purpose specifically references the Union, whose members are also the "Corporation's members." Article 4 goes on to authorize Health Benefits to do the following:

(b) to engage in such *other proper purposes incidental* to the foregoing;

(c) to engage in all other proper operations for which corporations may be formed and operated under the Pennsylvania Not–For–Profit Code.

*Id.* (emphasis added). Further, Article III, Section 1 of Health Benefits' bylaws states that:

[t]he governing powers of the Corporation shall be vested in *the Board* of Directors who shall have charge, control and management of the property, affairs and funds of the Corporation, and who *shall have the power* and authority to do and *perform all acts and functions not inconsistent with these Bylaws, the Corporation's Articles of Incorporation or law.*

R.R. A–169 (emphasis added). The Board of the Joint Trust, which incorporated Health Benefits, could have placed a limitation on Health Benefits' ability to endorse candidates, but it did not. *See* 15 Pa.C.S. § 5502(a) (stating that powers conferred by statute may be "subject to the limitations and restrictions contained in [the corporation's] articles").

The majority finds that Health Benefits lacks the power to engage in political activity because its charter does not specifically authorize such activity. This is backwards; it is a restriction that must be stated in the corporation's charter, not the authorization to conduct a specific activity. Health Benefits' articles give it the authority "to engage in all other proper operations for which corporations may be formed and operated under the Pennsylvania Not–for–Profit Code." Article 4(c); R.R. A–165. This grant of authority could not be broader in scope because the Nonprofit Corporation Law gives it the "capacity of natural persons to act," 15 Pa.C.S. § 5501, and all "powers and means appropriate" to effect its corporate purpose, 15 Pa.C.S. § 5502(a)(18). Any "limitation" or "restriction" on these powers must be stated in the corporation's articles or in a statute. 15 Pa.C.S. § 5502(a). No such limitation is expressed in Health Benefits' articles.

4. The majority rejoins that this case is not about free speech but, rather, the Board's authority to act. Majority op. at 1047, n. 10.

The two cannot be separated. If a corporation has a right of speech, then its board can order the exercise of speech.

The majority construes Health Benefits' corporate purpose as containing a limitation. However, this is contrary to the broad powers vested in the Board of Directors by the Nonprofit Corporation Law, and this statute controls over any common law cases, such as *Malone*, decided before the statute's enactment. However, the majority's construction of Health Benefits' articles is even contrary to *Malone's* directive that a corporation's stated purpose should not be read to create prohibitions but, rather, to allow "other dealings" that do not fall within the exact scope of the designated actions but are "at least very convenient." *Malone*, 182 Pa. at 322, 37 A. at 933. Government affects businesses and their ability to serve their customers. This is as true for non-profit businesses, such as Health Benefits and Blue Cross, as it is for businesses formed for profit. This is why businesses, whether organized as corporations or otherwise, engage in the incidental activities of engaging lobbyists and spending money on elections.

Management of the Union is a matter of direct concern to Health Benefits. As Lamb stated in his letter to Zampogna, "[i]t would be naive to believe that the outcome of the FOP election does not affect [Health Benefits]...." R.R. A–181. Endorsing a candidate that will provide competent management of the Union is a valid exercise of Health Benefits' express power to engage in "incidental" purposes under Article 4(b) of its charter.[5]

Finally, courts must defer to the judgment of a corporation's directors in deciding whether a challenged action is fairly "auxiliary" to the corporate purpose. By requiring the articles to specify the right to endorse candidates, the majority diminishes the discretion of any board of directors to decide what actions are in the best interest of the corporation. This approach will require the adoption of cumbersome articles of incorporation.

### The Endorsement of a Candidate is not a "Field of Activity"

The majority holds that Health Benefits' endorsement of Zampogna's opponent in the Union election is a new "field of activity" that is not "directly and immediately appropriate" to its corporate purpose of administering the Union's health insurance. Majority op. at 1049–50. Every corporate member of Health Benefits is a Philadelphia police officer eligible to vote in the Union election that was the subject of the Board's endorsement. *See* Article 4(a) (stating that "the Corporation's members ... are the members of the Fraternal Order of Police, Lodge No. 5 (a Pennsylvania nonprofit corporation.")); R.R. A–165. The corporate members of the two nonprofit corporations are the same. Zampogna himself made Health Benefits' performance a campaign issue. Given these circumstances, Health Benefits' endorsement appears directly, not remotely, incidental to its corporate purpose. More importantly, a corporation's occasional en-

---

**5.** The majority looks to Black's Law Dictionary for a general and abstract definition of "incidental power." Majority op. at 1049, n. 14. However, in the specific context of corporation law, our Supreme Court has established that an "incidental" corporate activity is any "subordinate" activity that is "connected" and "convenient" to the prosecution of the corporation's main purpose. *Malone*, 182 Pa. at 322, 37 A. at 933.

The majority concludes that partisan political activity is not a valid exercise of the cor-

poration's authority to engage in "purposes incidental" to its main corporate undertaking of administering the Union's health insurance. However, the majority offers no guidance on what is, or what is not, properly incidental. Its holding is grounded in the "public" origin of Health Benefits' revenue, but that rules out all incidental activities, such as the quarterly newsletter Health Benefits distributes to its members and their families.

dorsement of a candidate for office is not a new field of corporate endeavor.

In holding otherwise, the majority relies upon *Citizens' Electric Illuminating Co. v. Lackawanna & W.V.R. Co.*, 255 Pa. 176, 99 A. 465 (1916), and *In re Chosen Friends Castle No. 33*, 342 Pa. 60, 20 A.2d 237 (1941). These cases have no relevance to the current corporation statute; do not retreat from *Malone's* principles; and are distinguishable.

*Citizens' Electric* involved a railroad company, Lackawanna, which had constructed a power plant in Scranton to generate electricity to operate its trains. It then proceeded to make a large capital investment in that plant so that it could sell electricity to a coal mining company for the operation of its mine. The Supreme Court held that Lackawanna could build a power plant and could even sell its surplus electricity. It drew the line, however, at the production of electricity for the sole purpose of its sale; that was found to be a new business undertaking too far afield from its main purpose of transporting passengers and freight.[6]

The majority highlights a sentence in *Chosen Friends*, which reads:

Every *charter* when read with the statute from which it derives its being *desig-*

*nates a certain field of corporate activity;* by clear implication engaging in any other field of activity is prohibited as "ultra vires."

342 Pa. at 70, 20 A.2d at 241 (emphasis added). *Chosen Friends* concerned the question of whether a fraternal benefit association, the Knights of the Golden Eagle of the State of Pennsylvania, could "procreate subordinate lodges." *Id.* at 69, 20 A.2d at 241. At the time the Knights created The Chosen Friends Castle No. 33 as a subsidiary lodge, both entities were unincorporated associations. Later, each incorporated. When it incorporated, the Knights proposed a charter provision that would authorize it to create "subordinate associations called [c]astles;" however, this provision was stricken from the charter that was granted by the court. *Id.* at 64, 20 A.2d at 239. Stated otherwise, the evidence proved that the Knights' charter had been specifically limited to deny its board of directors the power to "procreate subordinate lodges," the very power it sought to exercise. This curious case has little relevance today because corporations routinely "procreate" subsidiary corporations.[7]

Neither *Citizens' Electric* nor *Chosen Friends* supports the conclusion that

6. The Supreme Court explained in *Citizens' Electric*, 255 Pa. at 183, 99 A. at 467, that a corporate power, "sometimes spoken of as an incidental power," is one "appropriate to the execution of the specific power granted." However, it also acknowledged that where a questionable act is "incidental or auxiliary to [the corporation's] business, it will not be unlawful, because not within the literal terms of the ... grant." *Id.* Notably, the Court observed that "a corporation has no natural rights, such as an individual or partnership has...." *Id.* at 179, 99 A. at 466. Today, corporations enjoy "the capacity of natural persons." 15 Pa.C.S. § 5501.

Today, Lackawanna could have simply created an affiliate corporation to enter the business of providing electrical service. Alterna-

tively, it could have created a division or "company" to provide the electrical service. A business corporation can enter any number of "fields of activity." It is a business decision as to how a corporation chooses to manage business risk. Regulatory statutes also impact matters of corporate organization.

Pennsylvania's current corporation statute was intended to make "Pennsylvania a more hospitable home for corporate charters" with its many "innovative provisions." Vincent F. Garrity, In, *Some Distinctive Features of the New Pennsylvania Business Corporation Law*, Vol. 45, THE BUSINESS LAWYER, 57, 83 (Nov. 1989).

7. Notwithstanding their charming names and professed commitments to benevolence, the Knights and the Castle were simply fighting

Health Benefits has undertaken a new "field of activity" by endorsing a candidate in the Union election. Spending funds to endorse a candidate for Union president is not a "field of activity" but a permitted "contribution" to a cause the Board thought important to Health Benefits. 15 Pa.C.S. § 5502(a)(9). In contrast to Lackawanna, Health Benefits did not make a large capital investment to set up a candidate evaluation business. An endorsement of a candidate, done apparently once by Health Benefits, is by definition an "incidental" activity and not a new corporate undertaking. Likewise, the Board did not violate a limitation in its charter, as did the Knights in *Chosen Friends*.

In any case, the Nonprofit Corporation Law controls, not these hoary rulings. The law vests broad discretion in Health Benefits' Board of Directors that is more than sufficient to sustain its action here.

Corporations routinely contribute to political campaigns and endorse political candidates where their directors believe these contributions and endorsements serve the best interests of the corporation. This is why legislatures, state and federal, have enacted laws to limit campaign contribu-

tions. *See, e.g., Citizens United,* 558 U.S. 310, 130 S.Ct. 876.

Simply, a corporation's endorsement of a candidate for office is an incidental activity that does not require a specific power in the corporation's articles in order for its board to engage in this activity.

### Harm to Health Benefits

The majority "agree[s] with Zampogna that Health Benefits would be irreparably harmed if the Board's approval of expenditures of public money for partisan activity was allowed to continue unabated." Majority op. at 1052. Zampogna produced no evidence of harm, either to his candidacy or to the ability of Health Benefits to administer the Union's health insurance program.[8] No insurance claim went unpaid.

Decisions about how to advance a corporation's purpose are committed to the board of directors, which manages the corporation on behalf of the corporation's shareholders or members. 15 Pa.C.S. § 5721.[9] The law states that:

A director of a non-profit corporation shall stand in a *fiduciary relation to the corporation* and shall perform his duties

about money. The Castle wanted to disband and split up the assets among its members. It claimed that it had incorporated for the purpose of effecting a divorce from the Knights. Because it had chartered the Castle, when both were unincorporated associations, the Knights contended the Castle's money belonged to it. The Supreme Court held that the Castle became a separate legal person when it incorporated and, thus, the monies in question belonged to the Castle.

If anything, this recognition of the rights of a corporation as a separate legal person supports Health Benefits' contention that it spent its money, not the City's, on its endorsement of McNesby.

8. For all we know, Health Benefits' endorsement of McNesby was a neutral factor in the election outcome; indeed, it might have helped Zampogna and hurt McNesby. The

record contains no evidence about the endorsement's efficacy.

9. Section 5721 of the Nonprofit Corporation Law states:

Unless otherwise provided by statute or in a bylaw adopted by the members, *all powers* enumerated in section 5502 (relating to general powers) and elsewhere in this subpart or otherwise *vested by law in a nonprofit corporation* shall be exercised by or under the authority of, and the business and affairs of every nonprofit corporation *shall be managed under the direction of, a board of directors.* If any such provision is made in the bylaws, the powers and duties conferred or imposed upon the board of directors by this subpart shall be exercised or performed to such extent and by such other body as shall be provided in the bylaws.

as a director ... in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

15 Pa.C.S. § 5712(a) (emphasis added).[10] To challenge a board of directors' action requires "clear and convincing evidence that the disinterested directors did not assent to such [challenged] act in good faith after reasonable investigation." 15 Pa.C.S. § 5715(d). Finally, the Nonprofit Corporation Law requires that

any act as the board of directors, a committee of the board or an individual director *shall be presumed to be in the best interests of the corporation.*

15 Pa.C.S. § 5715(d) (emphasis added).

Zampogna did not offer evidence to show how the Board of Directors' endorsement of his opponent harmed Health Benefits. The only evidence of harm to Health Benefits was Lamb's testimony that Zampogna's campaign statements about Health Benefits were inaccurate, misleading and harmful to its interest.[11]

The Board of Directors is entitled to a presumption, as a matter of law, that its endorsement of Zampogna's opponent was in the best interests of Health Benefits. 15 Pa.C.S. § 5715(d).[12] Further, the Board consulted with counsel before taking its vote; directors are entitled to rely on information and opinions of their counsel. 15 Pa.C.S. § 5712(a)(2). It was Zampogna's burden to prove otherwise by "clear and convincing evidence." 15 Pa.C.S. § 5715(d). He presented no evidence of harm, let alone clear and convincing evidence.

---

15 Pa.C.S. § 5721 (emphasis added). In addition, the bylaws of Health Benefits state that its directors

shall have charge, control and management of the property, affairs and funds of the Corporation, and ... *shall have the power and authority to do and perform all acts and functions not inconsistent* with these Bylaws, the Corporation's Articles of Incorporation, or law.

R.R. A–169 (emphasis added).

**10.** *See also* 15 Pa.C.S. § 512(a), which applies to "domestic corporations," and 15 Pa.C.S. § 1712(a), which applies to "business corporations." The operative language is identical in all three statutory provisions.

**11.** Zampogna speculated that, without an injunction, Health Benefits will continue to spend money in ways that he believes improper and wind up unable to provide medical benefits. A claim that directors are wasting corporate assets should be addressed in a derivative shareholders' action. *See, e.g., Drain v. Covenant Life Insurance Company,* 551 Pa. 570, 712 A.2d 273 (1998) (shareholders brought a derivative action against corporation for waste of corporate assets). Zampogna's speculation is not evidence.

**12.** Zampogna filed the wrong form of action by suing Health Benefits and not its directors. A claim that the directors have acted *ultra vires* takes the form of a derivative action, in which the shareholders or members bring suit on behalf of the corporation. 13 P.L.E.2d Corporations § 151. The business judgment rule insulates directors from liability for decisions that cause a loss so long as they act in good faith. 13 P.L.E.2d Corporations § 294. The business judgment rule encourages individuals to become directors, and it acknowledges the need for directors to be free to exercise discretion without judicial or shareholder second-guessing. *Cuker v. Mikalauskas,* 547 Pa. 600, 607, 692 A.2d 1042, 1047 (1997).

The majority states that "Zampogna filed the case seeking an injunction to prohibit the Board from expending public monies on unauthorized actions." Majority op. at 1050, n. 18. To enjoin the Board members requires that they, not the corporation they serve, be the named defendants. Likewise, public officials, not a private corporation, must be the defendants in an equity action intended to enjoin future expending of "public monies."

### Government Agency Power is Examined Differently

The majority relies on *McLaughlin v. School District of the Borough of Lansford*, 335 Pa. 17, 6 A.2d 291 (1939), to support the proposition that this Court can restrain a corporation's expenditure of funds. *McLaughlin* concerned a government agency's power to act, not that of a private corporation.

In *McLaughlin*, taxpayers brought suit against the Lansford School Board after it set a budget that required raising property taxes. The trial court found that the school board could have, and should have, cut costs rather than raising taxes. Accordingly, it issued an order revising the budget and enjoining the Board from raising taxes. The Pennsylvania Supreme Court affirmed, concluding that by needless over-spending of taxpayer money, the school board abused its discretion and did not perform its duties "intelligently." *Id.* at 24, 6 A.2d at 295.[13] *McLaughlin* is inapposite.

This Court routinely examines the power of government agencies when their actions are challenged. An administrative agency is a creature of statute and " 'can only exercise those powers which have been conferred upon it by the Legislature in clear and unmistakable language.' " *Aetna Casualty and Surety Company v. Insurance Department*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (quoting *Pennsylvania Human Relations Commission v. Transit Casualty Insurance Company*,

478 Pa. 430, 438, 387 A.2d 58, 62 (1978)) (holding that insurance department does not enjoy the open-ended authority to "infringe upon [insurers'] ability to manage their business"). This paradigm of analysis does not work when reviewing the challenged actions of a private corporation. The legislature may regulate the activities of a private person whether an individual, partnership or corporation. However, the legislature has vested private corporations with the capacity of "natural persons" and with authority to do any act, unless "restricted" or "limited" by statute or by the corporation's articles or bylaws. 15 Pa. C.S. § 5502(a)(18), (19).

### Self–Dealing of Board of Directors

The majority holds that the Board of Directors' action was *ultra vires* and "even more egregious because '[Health Benefits'] existence is dependent upon the advocacy of the [Union] [P]resident' " and, thus, "even more suspect." Majority op. at 1050.[14] The majority argues that under the United States Tax Code, Health Benefits' Board members engaged in self-dealing by spending corporate revenue to support the current Union president. 26 U.S.C. § 4941(d). It further contends that the Board members had a conflict of interest because the Union president influences the Joint Trust Board, which can shut down Health Benefits.

It is not a conflict of interest for board members to take action they believe will

---

**13.** It is not clear that *McLaughlin* remains good law or that trial courts have the plenary power to set school district budgets. The dissent in *McLaughlin* would have held that the "court below usurped the functions of the board...." *Id.* at 26, 6 A.2d at 296.

**14.** This language, adopted by the majority, in itself undermines the majority's premise that the Union election was not a matter of direct

and immediate concern to Health Benefits. Majority op. at 1049–50.

The quotation comes from the trial transcript and was made by Health Benefits' attorney in response to Zampogna's objection to a witness question. R.R. A–75. The trial court sustained Zampogna's objection, explaining that "[t]he question here is whether or not the defendant can spend money to engage in FOP elections for a declaratory judgment." *Id.*

serve the continued existence of the corporation they serve. This may be a central goal of any corporation's board of directors. Additionally, the Nonprofit Corporation Law specifies that it is not self-dealing for a director to take action to retain "the status or position of director" of the corporation he serves. 15 Pa.C.S. § 5715(e)(2)(iv).

## Public Funds

The majority asserts that Health Benefits has spent "public funds" or "City funds" and that the pleadings establish this as fact. Majority op. at 1045–46, n. 3.

Zampogna's Amended Complaint identified the City as the source of Health Benefits' revenue. It stated:

7. At all pertinent times, the Defendant, Law Enforcement Health Benefits, Inc., received substantial sums of money from the City of Philadelphia of approximately $965.00 per member of the Fraternal Order of Police each month to fund the health benefits for the active police officers, including the plaintiff, and their families.

Complaint, ¶ 7; R.R. A–140. Health Benefits responded to this allegation as follows:

7. Denied as stated. [Health Benefits] is funded solely by funds required to be made by the City of Philadelphia pursuant to the terms of a collective bargaining agreement between the City and Fraternal Order of Police Lodge No. 5. The monies are then forwarded by the Board of Joint Trusts that receives contractual contributions from the City of Philadelphia or are reimbursed to [Health Benefits] by the City as a result of the former's incursion of health care

expenses on behalf of covered law enforcement personnel.

Answer, ¶ 7; R.R. A–154.

Paragraph 7 of the Answer establishes, first, that the City paid out monies because it was contractually obligated to do so under its agreement with the Union. Second, under that agreement, the City paid monies to the Joint Trust, which, in turn, paid Health Benefits. The answer describes the relevant contractual transactions and the flow of funds, but it does not answer the question of whether the funds retained their public character after they have been paid to Health Benefits for services rendered.

When the City buys pencils from Staples Office Products, the City's money becomes Staples' money once the City's check is cashed. If the pencils are defective or the delivery not made, the City can sue for breach of contract. Staples will pay damages by using its own funds. It is the same for Health Benefits.

There is no known legal or accounting principle that supports the premise that Health Benefits spent "public funds," as opposed to its own corporate funds, in its endorsement of Zampogna's opponent. Majority op. at 1051–52. The City was the original source of Health Benefits' corporate revenue, but there is no evidence that Health Benefits used anything other than its own corporate account to pay for the printing and mailing of the postcard.

## Conclusion

In ruling in Health Benefits' favor, the trial court noted its agreement with Zampogna's position "from a moral standpoint" and cautioned that the Board of Directors "may wish to consider the propriety" of endorsing a particular candidate in a Union election. Trial Court Opinion at 3. It recognized, however, that courts are constrained to make legal, not moral, judg-

ments. It declined Zampogna's invitation to substitute its judgment for that of the Board of Directors. *See Anderson v. Colonial Country Club,* 739 A.2d 1118, 1123 (Pa.Cmwlth.1999) (holding that "courts should not substitute their judgment for that of the directors of a corporation....").  I would affirm the holding of the Court of Common Pleas of the First Judicial District that Health Benefits' Board of Directors had the authority to endorse the opponent of the plaintiff, Frank Zampogna, in a Union election and, thus, Zampogna could not show a clear legal right to a permanent injunction.[15]

Judge SIMPSON joins in this dissent.

15. In Pennsylvania, a party seeking a permanent injunction must establish, *inter alia,* a clear right to relief.  *Board of Revision of Taxes v. City of Philadelphia,* 607 Pa. 104, 133, 4 A.3d 610, 627 (2010).