# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| FRANK ZAMPOGNA, | : | No. 40 EAP 2014 |
| | : | |
| Appellee | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | 11/27/2013 at No. 1322 CD 2012, |
| v. | : | vacating and remanding the Order |
| | : | entered on 01/24/2012 in the Court of |
| | : | Common Pleas, Civil Division, |
| LAW ENFORCEMENT HEALTH | : | Philadelphia County at No. 03927 |
| BENEFITS, INC., | : | September Term, 2010. |
| | : | |
| Appellant | : | ARGUED: March 10, 2015 |
| | : | REARGUED: March 8, 2016 |
| | : | RESUBMITTED: October 20, 2016 |

## OPINION

**JUSTICE BAER**                                             **DECIDED: November 22, 2016**

In this discretionary appeal, we are asked to determine the narrow issue of whether Law Enforcement Health Benefits, Inc. ("LEHB"), a nonprofit corporation that administers health and welfare benefits to Philadelphia police officers as part of the union's collective bargaining agreement, is authorized under the Pennsylvania Nonprofit Corporation Law ("NCL"), 15 Pa.C.S. §§ 5101-6162, as well as its Articles of Incorporation, to expend its corporate funds to pay for a postcard sent to its members endorsing a candidate in a union election. For the reasons that follow, we find that nothing in the NCL nor the corporation's Articles prohibited the action at issue and that LEHB's action was sufficiently related to its corporate purpose to be permissible.

Accordingly, we reverse the decision of the Commonwealth Court and reinstate the trial court's order dismissing the declaratory judgment action against LEHB.

The facts of this case are not in dispute. The Fraternal Order of Police, Lodge No. 5 ("FOP") is a union which represents the interests of Philadelphia police officers in negotiating the terms and conditions of the officers' employment with the City of Philadelphia ("City"). Relevant to the instant matter, the FOP secured a collective bargaining agreement with the City, which provides health and welfare benefits to active and retired FOP members and their families. The agreement, *inter alia*, created a Joint Trust and established a Joint Trust Board, which is comprised of five individuals — four appointed by the FOP president and one appointed by the City — who supervise and manage the delivery of the FOP's benefits. As a result of the negotiations between the FOP and the City, the City is required to pay a specified amount per police officer per year to the Joint Trust for benefits, and the Joint Trust Board selects the entity to administer such benefits. At all relevant times, the Joint Trust Board selected LEHB to administer the benefits. LEHB is a nonprofit corporation specifically incorporated for the purpose of administering the benefits for the City's police officers and is controlled by a Board of Directors ("the Board").

As LEHB is a nonprofit corporation, it is governed by the NCL. The NCL requires nonprofit corporations to be incorporated for a purpose, specified in its articles, "including, but not limited to, any one or more of the following or similar purposes" listed in Section 5301(a).[1] 15 Pa.C.S. § 5301(a); see also id. § 5306(a)(3) (providing that a

---

[1] Specifically, Section 5301(a) provides:
(…continued)

nonprofit corporation's articles of incorporation must contain "[a] brief statement of the purpose or purposes for which the corporation is incorporated"). Consistent with that mandate, LEHB's Articles of Incorporation provide, in pertinent part, as follows:

> 4. The purpose of the Corporation is:
>
> (a) to receive, hold, invest, administer, and distribute funds to provide health and welfare benefits for, and on behalf of, the Corporation's members (and such members' eligible spouses and dependents), who are the members of the Fraternal Order of Police, Lodge No. 5 (a Pennsylvania nonprofit corporation) who are eligible to participate in the Blue Cross/Blue Shield health insurance plan (or such other health insurance plan) that is to be maintained by the Corporation for the benefit of such members;
>
> (b) to engage in such other proper purposes incidental to the foregoing;
>
> (c) to engage in all other proper operations for which corporations may be formed and operated under the Pennsylvania Not-for-Profit Code.

Addendum to Articles of Incorporation at 1 (Reproduced Record "R.R." at 232a) ("Articles").

---

(continued…)

> Except as provided in subsection (b) [pertaining to insurance], corporations may be incorporated under this article for any lawful purpose or purposes, including, but not limited to, any one or more of the following or similar purposes: athletic; any lawful business purpose to be conducted on a not-for-profit basis; beneficial; benevolent; cemetery; charitable; civic; control of fire; cultural; educational; encouragement of agriculture or horticulture; fraternal; health; literary; missionary; musical; mutual improvement; patriotic; political; prevention of cruelty to persons or animals; professional, commercial, industrial, trade, service or business associations; promotion of the arts; protection of natural resources; religious; research; scientific and social.

15 Pa.C.S. § 5301(a).

In 2010, Appellee Frank Zampogna, a Philadelphia police officer, campaigned for FOP President, running against the incumbent FOP President, John McNesby. Leading up to the election, McNesby informed LEHB that Zampogna had been making pronouncements to FOP members regarding their medical benefits and the City's monthly contributions.[2] These pronouncements were viewed by LEHB as misrepresentations designed to gain political advantage in the FOP election.[3] Given this concern, a few weeks before the election, the Board unanimously voted to "respond appropriately" if "any candidate misstates, misrepresents, or publishes misleading or false information regarding LEHB or demeans its officers." Active Directors Meeting Minutes, 9/7/2010, at 1 (R.R. at 227a).

Following the Board meeting, and in response to Zampogna's allegedly false statements, LEHB mailed postcards to FOP members which, *inter alia*, endorsed McNesby in the election, accused "[o]ne of the FOP Presidential candidates" of making "grossly misleading and deceptive statements" regarding LEHB, and opined that that candidate "is not competent enough and too inexperienced to lead the FOP and its 14,000 members." Postcard (R.R. at 222a).[4] The cost to mail and print the postcards totaled $3,840 and was paid out of LEHB's general funds. LEHB's administrator, Thomas Lamb, stated that McNesby was not involved in the decision to mail the postcard, and Zampogna did not present any evidence to the contrary. See N.T., 1/10/2012, at 57.

---

[2] The record does not establish the specific content of these statements.

[3] The truthfulness and accuracy of the statements are beyond the scope of this Opinion.

[4] LEHB also included the same message in its newsletter, at no additional cost.

Six days before the election, in response to the mailing, Zampogna filed an action seeking declaratory relief barring LEHB from further expending its funds to endorse a candidate in an FOP election.[5]  In support of his position, Zampogna argued that LEHB's expenditure was in "direct violation" of LEHB's Bylaws, Articles, and the NCL.  Zampogna's Amended Complaint at 7-8 (R.R. at 214-15a).  Additionally, Zampogna claimed that LEHB's actions were "unfair" and "an unlawful expenditure of public funds given solely for medical benefit purposes."  Id. at 5, 8 (R.R. at 212a, 215a).

While the case was pending, Zampogna lost the election.  The case subsequently proceeded to a nonjury trial, and, ultimately, the trial court denied Zampogna's request for declaratory relief.  The trial court began its review with LEHB's Bylaws, which provided the Board with the power to take any action so long as it was not inconsistent with the Bylaws, the Articles, or the law.  The trial court concluded that neither LEHB's Bylaws, nor its Articles, prohibited LEHB from making endorsements in FOP elections.  Moreover, the trial court examined Section 5502 of the NCL, which enumerates the general powers of nonprofit corporations, and determined that "[n]owhere in [the] statute does it state that corporations are prohibited from engaging in political activity."  Tr. Ct. Op., 5/22/2012, at 2 (citing 15 Pa.C.S. § 5502).  Zampogna filed post-trial motions, which the court denied, and he appealed, asserting, *inter alia*,

---

[5] Zampogna also sought injunctive relief.  However, the election occurred while the case was pending, rendering such relief moot.

that the trial court erred in finding that LEHB's actions in endorsing a candidate in the FOP election did not violate LEHB's Articles, Bylaws, or the NCL.[6]

On appeal, a split *en banc* panel of the Commonwealth Court reversed. Zampogna v. Law Enforcement Health Benefits, Inc., 81 A.3d 1043 (Pa. Cmwlth. 2013). The majority acknowledged that the NCL grants a nonprofit corporation the power to take several actions, including making "contributions and donations," albeit "subject to the limitations and restrictions contained in its articles." Zampogna, 81 A.3d at 1047 (quoting 15 Pa.C.S. § 5502(a)).[7] However, the majority disagreed with the trial court that the action at issue was not restricted by LEHB's Articles. Instead, the majority viewed LEHB's purpose statement as a restriction on its powers, reasoning that any action taken by the corporation must be sufficiently related to its purpose "to receive, hold, invest, administer, and distribute funds to provide health and welfare benefits for, and on behalf of, the corporation's members (and such members' eligible spouses and dependents)." Id. at 1048 (quoting Articles at 4(a)). In the majority's view, endorsing

---

[6] Initially, Zampogna appealed to the Superior Court. However, as LEHB is a nonprofit corporation subject to the NCL, the Superior Court transferred this matter to the Commonwealth Court because the case fell within that court's jurisdiction pursuant to 42 Pa.C.S. § 762(a)(5) (granting the Commonwealth Court exclusive jurisdiction over appeals involving a nonprofit corporation subject to the NCL).

[7] Notably, Section 5502(a) speaks only in terms of limitations and/or restrictions contained in the law or a corporation's articles. See 15 Pa.C.S. § 5502(a) (providing that a nonprofit corporation has broad powers "[s]ubject to the limitations and restrictions imposed by statute . . . [or] contained in its articles"). However, 15 Pa.C.S. § 5503, the section immediately following Section 5502, refers to a "limitation upon the business, purposes or powers of a nonprofit corporation, expressed or implied in its articles or bylaws or implied by law," indicating that a restriction on the corporation could be contained in either the articles or the bylaws. Because there is no purported restriction in LEHB's Bylaws on the action taken here, and as our analysis revolves around Section 5502 and not Section 5503, we will not discuss LEHB's Bylaws any further.

McNesby was not a direct administration of benefits. To the contrary, the majority concluded, McNesby was "an individual unrelated to [LEHB's] purpose," and, therefore, mailing the postcard "f[ell] outside of both the Law, and [LEHB's] Articles of Incorporation." Id. at 1049.

The majority went on to address LEHB's argument that the endorsement, while not a direct administration of benefits, was nonetheless authorized pursuant to the company's incidental power. See Articles at 4(b) (providing LEHB with the power "to engage in such other proper purposes incidental to the [administration of benefits]."). In rejecting this argument, the majority relied on a case from 1916 which stated that a corporation's incidental power must be "directly and immediately appropriate to the execution of the specific power granted, . . . not one that has merely some slight or remote relation to it." Id. (quoting Citizens' Elec. Illuminating Co. v. Lackawanna & W.V.R. Co., 99 A. 465, 467 (Pa. 1916)). Here, the majority reasoned, "campaigning for a union presidential candidate is not directly and immediately appropriate to providing healthcare benefits to the corporation's Members," and, thus, it concluded that such activity cannot fall within the scope of LEHB's incidental power. Id. at 1049-50.

Seemingly in contradiction to its finding that McNesby's election had nothing to do with LEHB's corporate functions, the majority noted its belief that the action here was "suspect" and "egregious" because of the relationship between the FOP president and LEHB, as the president appoints the members of the Joint Trust Board, which ultimately selects the company to administer benefits. Id. at 1050. The majority viewed this construct as creating a conflict of interest for the Board and opined that approving the

endorsement constituted self-dealing, despite the fact that Zampogna's complaint and brief to the Commonwealth Court made no allegation of any conflict of interest.

Finally, the majority summarily concluded that LEHB "would be irreparably harmed if the Board's approval of expenditures of public money for partisan activity was allowed to continue unabated." Id. at 1051-52. However, the majority did not cite any authority to support its proposition that LEHB's funds were public nor did it explain how the public character of the funds factored into the court's analysis. Moreover, the majority did not develop how an action taken in the context of a private, union election constituted prohibited "partisan activity." Nonetheless, the majority held that the trial court erred in finding the endorsement was within the scope of the Board's authority. The Commonwealth Court thus vacated the trial court's order and remanded for entry of an order "declaring that the Board's expenditure of public funds on partisan activity violates the [NCL], and [LEHB's] Articles of Incorporation." Id. at 1052.

Judge Leavitt filed a dissent, joined by Judge Simpson, contending that the action taken fell within the broad powers granted to LEHB by the NCL and its Articles. Zampogna, 81 A.3d at 1052 (Leavitt, J., dissenting). The dissent opined that, contrary to the majority's position, "it is a restriction that must be stated in the corporation's charter, not the authorization to conduct a specific activity," and observed that, here, LEHB's Articles do not limit LEHB's ability to endorse candidates in a union election. Id. at 1055. Rather, the dissent concluded that, because the management of the FOP and the outcome of the election would directly impact LEHB, endorsing a candidate whom it determined would best manage the FOP was a permissible use of its incidental power under its Articles.

Additionally, the dissent differed with both the majority's conclusion that the Board engaged in self-dealing, and its characterization of the funds spent by LEHB as public funds. With respect to the former, the dissent emphasized that "any act as the board of directors . . . shall be presumed to be in the best interests of the corporation," id. at 1059 (quoting 15 Pa.C.S. § 5715(d)), and noted that Zampogna failed to provide clear and convincing evidence to rebut the presumption. The dissent also opined that a board's action which it deems "will serve the continued existence of the corporation" does not create a conflict of interest, and that the NCL specifically provides that a director's action to retain his position does not constitute self-dealing. Id. at 1060-61 (citing 15 Pa.C.S. § 5715(e)(2)(iv)). As to the funds paid by LEHB, the dissent suggested the funds were corporate funds rather than public funds because they had been paid to LEHB for services rendered, became part of LEHB's corporate account, and, thus, had lost their public character.

Following the Commonwealth Court's decision, LEHB filed a petition for allowance of appeal with this Court, which we granted to review whether the Commonwealth Court erred in determining that LEHB's action of endorsing McNesby was not authorized.[8]

---

[8] Specifically, we granted to review the following issues:

(a) Whether Courts may disregard the vital function of corporate self-governance by second-guessing the decisions of corporate directors and failing to provide the required deference to their decision simply because the court may not agree with the decision?

(b) Whether a court may simply usurp the role of corporate directors by negating the presumption of good-faith to the decisions of directors required by law by simply asserting,

(…continued)

LEHB begins by contending that the Commonwealth Court invalidated a corporate action simply because the court disagreed with the action. In LEHB's view, the NCL grants nonprofit corporations broad powers, including: 1) the ability to make donations and contributions; 2) "[t]o have and exercise all of the powers and means appropriate to effect the purpose or purposes for which the corporation is incorporated;" and 3) to exercise all other powers vested in the corporation by law. 15 Pa.C.S. § 5502(a)(9), (18), (19). Notwithstanding these provisions, LEHB acknowledges that a nonprofit corporation's powers are subject to any limitation or restriction imposed by statute or the corporation's articles. 15 Pa.C.S. § 5502(a). Accordingly, LEHB argues that a nonprofit corporation's action is authorized unless it is prohibited or restricted.

However, LEHB's argument does not end with searching for an explicit statement within the corporation's Articles or the law prohibiting the action at issue, which was the view taken by the trial court here. Instead, like the Commonwealth Court majority, LEHB views its corporate purpose as a restriction contained within its Articles that limits its powers, conceding that any action it takes must be related to providing benefits for its members. Notwithstanding its agreement on the relevance of its corporate purpose, LEHB parts from the Commonwealth Court's ultimate conclusion, contending that the

(continued…)

without requiring any proof thereof, a conflict of interest by the directors?

(c) Whether funds, whose original source was a public entity, retain their public character once the public entity distributes those funds to a private corporation in satisfaction of an obligation, and after the private corporation had retained those funds as corporate assets, and after that corporation utilized the corporate assets for a corporate purpose?

Zampogna v. Law Enforcement Health Benefits, Inc., 99 A.3d 531 (Pa. 2014) (order).

court failed to consider the entire context of LEHB's action when it determined the conduct was not related to LEHB's corporate purpose.

To that end, LEHB argues that endorsing McNesby was related to enhancing benefits for its members in two ways. First, LEHB asserts, the FOP President appoints four of the five members of the Joint Trust Board, which has the capability of removing LEHB as the selected vendor to administer benefits. Thus, when Zampogna made what were perceived to be "intentional, material misrepresentations to members" concerning LEHB's administration of their benefits, LEHB directors became concerned that Zampogna would negatively impact the organization if he were elected. LEHB's Brief at 19. Second, and more importantly, LEHB directors believed that McNesby would be more efficient than Zampogna in negotiating with the City, which in turn could improve LEHB's revenue stream and its ability to provide inexpensive benefits. For these reasons, LEHB believes the FOP President is "a matter of direct concern" to LEHB and concludes that its action in endorsing McNesby was "at the very least, incidental to the function of [LEHB]," if not directly related. Id. at 20-22. Accordingly, LEHB asserts its action was sufficiently related to its corporate purpose so as to satisfy the limitation contained within its Articles.

Turning to the Commonwealth Court's discussion regarding the alleged conflict of interest, LEHB asserts the Commonwealth Court majority erred because it "simply averr[ed] a conflict of interest" existed "absent any evidence whatsoever" to support such an averment. Id. at 26. LEHB contends that, pursuant to the NCL, the acts of a director are "presumed to be in the best interests of the corporation," and a challenge to such requires clear and convincing evidence to rebut the presumption. Id. at 27

(quoting 15 Pa.C.S. § 5715(d)). LEHB contends that Zampogna "presented no evidence . . ., let alone clear and convincing evidence" that a conflict of interest existed. Id. at 27 (quoting Zampogna, 81 A.3d at 1059 (Leavitt, J., dissenting)). Indeed, as noted previously, Zampogna did not assert a conflict of interest in his pleadings.

Lastly, LEHB argues the Commonwealth Court majority erred by labeling the assets used to print and mail the postcards at issue as "public funds." While LEHB acknowledges that the funds paid by the City to LEHB originally were public in nature, it suggests that the funds lost their public character once the City transferred them to the Joint Trust pursuant to the collective bargaining agreement. Specifically, LEHB opines that, once the funds leave the City's possession, the City has met its contractual obligation of contributing a specified amount of money per FOP member. LEHB notes that, thereafter, the funds are either received by the Joint Trust, which forwards the money to LEHB to administer benefits, or the City may pay LEHB directly to reimburse it for expenses which have already been incurred on behalf of an eligible member. LEHB emphasizes that, once the funds are placed in the Joint Trust or forwarded directly to LEHB, they become the private assets of the corporation and, thus, cease to retain their public character.

By contrast, Zampogna contends LEHB was not authorized to endorse a candidate in the FOP election. Zampogna argues LEHB's Articles do not authorize it to endorse a candidate as they make clear that LEHB's sole purpose is to administer benefits for FOP members and their families. While the Articles also give LEHB incidental power, Zampogna maintains that endorsing a candidate in the FOP presidential election is not incidental to effectuating the payment of benefits.

For the first time before this Court, Zampogna claims that LEHB's action was a conflict of interest because the candidate it endorsed was the then-current FOP president, who appointed four members of the Joint Trust Board, and, thus, in his view, the individual in control of the monies going to LEHB which ultimately funded the mailing endorsing him. Notably, Zampogna does not cite to any evidence of record to support the assertion that LEHB's board acted under a conflict of interest, such as testimony suggesting that McNesby requested LEHB to endorse him. Instead, taking his lead from the Commonwealth Court's majority opinion, Zampogna infers a conflict of interest based on the FOP President's ability to appoint members of the Joint Trust Board. To Zampogna, the conflict of interest "is obvious," and thus he dispenses with the need to support it. Id. at 36.

Lastly, Zampogna repeatedly notes his belief that LEHB's action was a misuse of public funds. In this vein, Zampogna argues LEHB's funds have a "publicly designated purpose" — namely, the payment of benefits for FOP members and their families. Id. at 40. Consistent with his argument that LEHB's actions here did not relate to its corporate purpose, Zampogna also contends that LEHB improperly used public funds for a non-public purpose. Again, however, Zampogna cites to no relevant corporate law to support his position that the use of originally "public" funds somehow alters or heightens our review of whether a nonprofit corporation's action is authorized.[9]

---

[9] The Pennsylvania Public Utilities Commission filed an *amicus curiae* brief in this matter, without indicating support for either party. Therein, it described that it is involved in monitoring ratepayer funds which it deems to be "public funds" and which have been deposited into four sustainable energy funds in order to ensure that such funds are being used to promote: "(1) the development and use of renewable energy and clean energy technologies; (2) energy conservation and efficiency; and (3) renewable
(…continued)

In this case, we are asked to determine whether a nonprofit corporation's action was permitted under the NCL, which is a question of law, for which our standard of review is *de novo* and our scope of review is plenary. A.S. v. I.S., 130 A.3d 763, 768 (Pa. 2015). Before analyzing the specific action in question, it is worth reviewing a brief history of Pennsylvania corporate law. In the early years of our Commonwealth, corporations were required to be incorporated for a specific purpose and were limited to take only those actions that furthered the corporation's purpose. Malone v. Lancaster Gas Light & Fuel Co., 37 A. 932, 933 (Pa. 1897). Because of this narrow limitation on early corporations' powers, if a corporation's action was not "fairly considered incidental or auxiliary to" its corporate purpose, a court could deem the action unauthorized as beyond the scope of the corporation's authority (*i.e.*, *ultra vires*). Id.

Malone involved the Lancaster Gas Company, chartered for the specific purpose of "manufacturing and supplying illuminating and heating gas." Id. When the company sought to sell gas-consuming appliances, one of the company's stockholders challenged the action as outside the company's authority. This Court determined that the action was authorized, holding that a corporation may take any action that is not within the literal terms of the corporate grant so long as it is "at least very convenient" to the corporation's purpose. Id. at 933. Because selling gas-consuming appliances would increase the demand for Lancaster's gas supply, this Court concluded that the action was sufficiently related to the corporation's chartered purpose of selling gas.

---

(continued…)
business initiatives and projects that improve the environment in the companies' electric service territories." *Amicus* brief at 5-6. *Amicus* urges this Court not to issue a decision which would adversely affect its continued audit authority over the funds and its ability to compel compliance with the foregoing public purposes.

Compare with Citizens' Electric Illuminating Co. v. Lackawanna & W.V.R. Co., 99 A. 465, 467 (Pa. 1916) (holding that a railroad company was unauthorized to sell excess electricity the company generated because such action was not "directly and immediately appropriate" to functioning as a railroad).

However, around the end of the 19th century and the beginning of the 20th century, states began to "replace the restrictive set-pattern acts of the 1880s with the liberal and flexible 'enabling' corporation statutes that characterized the twentieth century." Harwell Wells, The Modernization of Corporation Law, 1920-1940, 11 U. Pa. J. Bus. L. 573, 585 (2009). As part of this movement, Pennsylvania enacted its more liberal Business Corporation Law in 1933. See Act of May 5, 1933 (P.L. 364, No. 106) (known as the Business Corporation Law of 1933).[10] The current language of the BCL, as amended in 1988, provides that a "business corporation shall have the legal capacity of natural persons to act," 15 Pa.C.S. § 1501, and sets forth a broad, non-exhaustive list of permissible corporate powers. 15 Pa.C.S. § 1502(a) (granting a business corporation broad corporate powers "[s]ubject to the limitations and restrictions imposed by statute or contained in its articles"); 15 Pa.C.S. § 1502 Committee Comment--1988 ("The provisions of subsection (a) are intended to be broad enabling provisions.").

---

[10] Our overview begins with the BCL, which in its current form governs only for-profit corporations. However, at the time of its original enactment in 1933, there was no separate statute governing nonprofit corporations. It was not until 1972 that Pennsylvania enacted the NCL, which provides specific provisions for nonprofit corporations. Accordingly, we find the history underlying the BCL is relevant to framing our discussion of the NCL. More importantly, the section of the NCL governing nonprofit corporate powers indicates it was patterned after the BCL, as discussed in more detail *infra*. See 15 Pa.C.S. § 5502, Source Note--1990 ("Patterned after 15 Pa.C.S. § 1502," which grants statutory powers to for-profit corporations).

One of the effects of Pennsylvania's modernized corporate statute is to remove the requirement that for-profit corporations be incorporated for a specific, limited purpose; in fact, a business corporation today need not include any purpose statement in its articles of incorporation. 15 Pa.C.S. § 1301, Committee Comment--1988 ("Under this section if the articles of a business corporation contain no purpose clause, the corporation has in effect an all-purpose charter."). Instead, corporations are permitted to be incorporated for "any lawful purpose," id., and, accordingly, can take any type of corporate action, regardless of its relationship to a corporation's purpose. 15 Pa.C.S. § 1502, Committee Comment--1988 ("It is intended . . . that the corporate purposes of the [for-profit] corporation shall be irrelevant.").

Because for-profit corporations are no longer limited to taking actions related to their corporate purposes, the *ultra vires* doctrine is, in effect, no longer viable to challenge a for-profit corporate action. See Kent Greenfield, Ultra Vires Lives! A Stakeholder Analysis of Corporate Illegality (with Notes on How Corporate Law Could Reinforce International Law Norms), 87 Va. L. Rev. 1279, 1280 (2001) (explaining that, today, "the doctrine of 'ultra vires,' which limited corporations to certain purposes and powers, is dead or at least deathly ill"). Rather, a challenge to a corporate action proceeds in modern jurisprudence under what is known as the business judgment rule, which embodies the "policy of judicial noninterference with business decisions of corporate managers," and insulates corporate directors from "second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." Cuker v. Mikalauskas, 692 A.2d 1042, 1046 (Pa. 1997); see also 15 Pa.C.S. § 1502 Committee Comment--1988 ("Regulation of the exercise of

the powers granted is accordingly intended to come through application of the business judgment rule under 15 Pa.C.S. § 1721 rather than through the doctrine of ultra vires. *Cf.* 15 Pa.C.S. § 1503.")[11]

With these principles of corporate law in mind, we turn to the NCL, as LEHB is a nonprofit corporation. Just as the BCL grants to for-profit corporations, the NCL provides nonprofit corporations with "the legal capacity of natural persons to act." 15 Pa.C.S. § 5501. Similarly, the NCL gives nonprofit corporations the same general powers as the BCL gives for-profit corporations, using nearly identical language. See 15 Pa.C.S. § 5502, Source Note--1990 ("Patterned after 15 Pa.C.S. § 1502," which grants statutory powers to for-profit corporations).[12] For example, nonprofit corporations have the authority to "exercise all of the powers and means appropriate to effect the purpose or purposes for which the corporation is incorporated." 15 Pa.C.S. § 5502(a)(18). This language is expansive, not restrictive. Additionally, the NCL gives a nonprofit corporation broad powers, such as the powers "[t]o conduct its business, carry on its operations," and "[t]o have and exercise all other powers" otherwise vested in the corporation by law, "[s]ubject to the limitations and restrictions imposed by statute . . . [or] contained in its articles." 15 Pa.C.S. § 5502(a)(15), (19). Accordingly, the NCL authorizes all nonprofit corporate actions that are not prohibited by the NCL or the corporation's articles.

---

[11] Whether the business judgment rule would apply in this case is irrelevant to our holding, as we ultimately conclude that the action here was sufficiently related without giving deference to the Board's decision. Thus, we discuss this rule merely to establish generally the level of appropriate court involvement in corporate decisions, which informs our view of how the NCL should be interpreted.

[12] The only difference is that for-profit corporations have an additional power relating to acquisitions and take-overs, which are not relevant to nonprofits.

Although the NCL is similar to the BCL in many ways, notably, nonprofit corporations are required by the NCL and its regulations to be incorporated for a specified purpose, as opposed to for-profit corporations, which may be incorporated for "any lawful purpose." Compare 19 Pa. Code § 41.4(b) (providing that "[t]he stated purposes of a nonprofit corporation may not consist of solely a statement to the effect that its corporate purpose is to engage in all lawful business"), with 15 Pa.C.S. § 1502, Committee Comment--1988 ("It is intended further that the corporate purposes of the [for-profit] corporation shall be irrelevant."). Accordingly, we find that a nonprofit corporation's actions must be related to its corporate purpose. To hold otherwise would render the requirement that a nonprofit corporation state a corporate purpose other than "any lawful purpose" meaningless.

However, the fact that nonprofit corporations have an additional requirement compared to for-profit corporations does not necessarily mean that we must construe this requirement narrowly. In other words, we do not view this requirement as relegating nonprofit corporations back to the early twentieth century, when every corporation was limited to taking actions which were directly in furtherance of its corporate purpose, which, as set forth above, is a limitation that has since been abandoned. Wells, supra at 585. Instead, we find that this limitation should be broadly interpreted considering the legal principles expounded above. Additionally, the NCL itself indicates that this purpose requirement is not meant to be overly restrictive, as it requires nonprofit corporations to include only a "brief" statement of purpose in their articles of incorporation. 15 Pa.C.S. § 5306(a)(3). The applicable statutory and regulatory provisions contain a non-exhaustive list of broad permissible purposes such

as "athletic," "charitable," and "educational." See 15 Pa.C.S. § 5301(a); 19 Pa. Code § 41.4(a). Moreover, we are guided by the fact that the NCL is patterned after the BCL, and nothing in the NCL or its regulations place an emphasis on the corporate purpose distinction between nonprofit and for-profit corporations. Accordingly, we determine that the purpose statement requirement was not intended to create a marked difference in how nonprofit corporations are to be governed, as opposed to for-profit corporations.

For these reasons, we hold that the interplay between a nonprofit corporation's corporate purpose and that corporation's authority to take corporate action must be construed in the least restrictive way possible, limiting the amount of court interference and second-guessing, which is reflective of both modern for-profit and not-for-profit corporations, and the modern corporate business laws that govern them. Thus, we find that a nonprofit corporation's action is authorized when: 1) the action is not prohibited by the NCL or the corporation's articles; and 2) the action is not clearly unrelated to the corporation's stated purpose. See 15 Pa.C.S. § 5502(a)(18) (providing that a nonprofit corporation may "exercise all of the powers and means appropriate to effect the purpose or purposes for which the corporation is incorporated" unless restricted by statute or its articles); 15 Pa.C.S. § 5306(a)(3) (requiring a nonprofit corporation to list a brief purpose statement in its articles).

Turning to the facts of the instant case, Zampogna has not pointed us to any language in the NCL or LEHB's Articles that prohibited LEHB's action here. As such, LEHB's action is authorized so long as it is not clearly unrelated to its corporate purpose of administering benefits to its members as set forth in its Articles. Ultimately, we agree

with LEHB that its action was sufficiently related to administering benefits to its members and, therefore, it was authorized.

The facts of the instant case exemplify why courts should not act as super-boards second guessing decisions of corporate directors, as courts are "ill-equipped" to become "enmeshed in complex corporate decision-making." Cuker, 692 A.2d at 1046. At first blush, endorsing a candidate in a union election seems unrelated to the administration of medical benefits. However, such a simplistic view of the action at issue here ignores the structure of the CBA between the City and the union and the effect the union president has over LEHB's revenue source and its very existence. Because the union president has a direct impact on LEHB's ability to function effectively, endorsing a candidate the corporation believes will better serve its members is not unrelated to its corporate purpose of administering benefits for its members. Accordingly, we conclude that LEHB's action was sufficiently related to the corporate purpose as set forth in its Articles, rendering the action authorized.

As we find that LEHB's action here was authorized, we need not address the Commonwealth Court's discussion of LEHB's alleged conflict of interest, which the court advanced to justify further its decision to reject the LEHB Board's action. Moreover, we recognize that Zampogna did not present any evidence of a conflict of interest nor did he argue one existed before the trial court or the Commonwealth Court. We agree with LEHB that by failing to introduce any evidence of a conflict of interest, Zampogna failed to meet his burden. Accordingly, the record does not support the Commonwealth Court majority's determination that the Board's action here constituted an improper conflict of interest or self-dealing, and we decline to discuss this issue any further.

Turning to the "public funds" issue, we note that Zampogna cites to no authority to support the proposition that the funds at issue here were indeed public funds. To the contrary, we conclude that the originally public funds lost their public character once the City paid them to LEHB in fulfillment of its contractual obligation. Specifically, the City agreed to pay a specific amount of money per police officer to the Joint Trust, not only to pay for the ultimate healthcare benefit that each police officer receives, but also to pay for the administration of those benefits. Once the City paid the specified amount to the Joint Trust pursuant to the collective bargaining agreement, it had fulfilled its healthcare benefit obligation, rendering the funds no longer within the City's control. At that point, the funds were converted from public funds to private moneys in the sole control of LEHB. As such, there was no legal impediment to LEHB's use of its own private moneys under these circumstances.[13]

We note that Zampogna's challenge to LEHB's endorsement focused on the mere fact of endorsement, as he did not present any evidence to suggest that the cost of the endorsement was excessive or resulted in any diminution in benefits to LEHB's members. In other words, Zampogna's complaint is not one asserting corporate waste. Instead, Zampogna simply argued that the endorsement was unauthorized. Accordingly, our inquiry is limited to whether the endorsement itself was authorized and does not take into consideration the cost of such. Thus, we caution that this decision does not stand for the proposition that LEHB could spend on endorsements unabated, as that issue is not before us.

---

[13] Because we conclude that the funds at issue were private, we do not speak to whether public funds may be used to endorse candidates in a private, union election.

For the reasons set forth above, the order of the Commonwealth Court is reversed, and the matter is remanded for reinstatement of the trial court's order dismissing Zampogna's complaint.

Chief Justice Saylor and Justices Donohue, Dougherty and Mundy join the opinion.

Justices Todd and Wecht file concurring opinions.